[Civ. No. 27192. First Dist., Div. Two. Apr. 26, 1971.]

NILES W. LARSON, Plaintiff and Respondent, v.
CITY OF OAKLAND, Defendant and Appellant.

### COUNSEL

Edward A. Goggin, City Attorney, and Mark B. Shragge, Deputy City Attorney, for Defendant and Appellant.

Naphan & Arne and Jon A. Rantzman for Plaintiff and Respondent.

### OPINION

DAVID, J.*—Defendant city appeals from an order granting a new trial rendered on the basis that respondent was not a "prisoner" under Government Code section 844.6, subdivision (a), as a matter of law. The action arose upon respondent's complaint for damages for personal injuries sustained as a result of alleged assault and battery committed by defendant city's police officer. The present order reversed an order granting defendant's motion for nonsuit.

The testimony presented at trial pertinent to the issue on appeal may be summarized as follows: Shortly after 2 a.m. on September 29, 1964, Oakland Police Officer Ralph Sigler, Jr., observed a 1963 Buick Skylark automobile being driven by respondent, then age 22, proceed through a flashing red stoplight without making a complete stop. Accompanying respondent in his vehicle was Patrick Moran, then age 20. Officer Sigler testified he heard the vehicle's tires screeching and saw it slide "halfway around in the intersection." The officer said he waved a flashlight at the vehicle, calling out several times for it to pull over, but that after slowing down and coming within a few feet of him, it proceeded on without stopping.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

The officer then suspected that the vehicle had been stolen, and that the occupants were evading arrest. He activated the red light on top of his police car and began chasing after the other vehicle. He turned a corner and first observed the vehicle several blocks ahead of him, and estimated that it was then traveling over 40 miles per hour in an area with a speed limit of 25 miles per hour. He lost sight of the vehicle after it turned into another street, but soon observed it backing up at the end of a dead-end street. It was parked in the driveway of a house. He stopped the police car to the rear of the vehicle.

The officer testified that he drew his revolver, approached the driver's side of the vehicle, and ordered both passengers to exit from that side. Respondent told him he would not resist. Officer Sigler said he then searched both suspects for weapons, found none, and was preparing to handcuff respondent and Moran together when respondent "jerked his head back," causing the officer to push respondent's "face forward openhandedly" and forcibly handcuff both of his arms behind his back.

The officer testified that he then began to walk respondent toward his police car, keeping his right hand on the handcuffs and his left hand on respondent's left shoulder. They crossed a portion of lawn, and as they approached the curb where his vehicle was parked, the officer said he "slipped on something, whatever was on my shoe from the lawn area." He stated that as a result both he and respondent struck against the side of the vehicle, though neither fell.

The officer testified that he observed respondent bleeding from his nose and mouth. He put respondent into the vehicle, and then Moran, and backed out of the dead-end street. He radioed for assistance, ascertained that the vehicle had not been stolen, and for the first time asked respondent and Moran for identification. A patrol wagon soon arrived, the handcuffs were removed from respondent and he was taken to a hospital for treatment of his facial injuries. Officer Sigler testified that he had arrested respondent while waiting for assistance after backing out of the dead-end street.

Respondent and Moran testified that although their vehicle came to a "Hollywood stop" at the flashing red stoplight, rather than a full, complete stop, both said the car did not turn or spin in the intersection, and denied seeing anyone waving a flashlight or calling to them, or slowing down for anyone in the street. Neither was aware their vehicle was being followed and first noticed the police car while turning around at the end of the dead-end street.

Respondent testified that after he stepped out of the vehicle, the officer ordered him to place his hands on its trunk lid, then frisked him, and told

him to put his hands behind his back. As he did, the officer "yanked up" on one of his arms, almost lifting him off the ground, causing him to straighten up, and then hit him two, three or four times in the back of his head, back or shoulders. These blows did not cause any of the injuries alleged in the present action.

Respondent testified that the officer then began leading him to the police car, pushing him with one hand on his handcuffed arms and the other on his shoulder or neck. When respondent was about 4 to 5 feet away from the car, the officer gave him a "hard shove," causing him to go "head-first into the car." He said he hit the top of the car near the door and screamed from pain as he began to fall. The officer remained standing, and then grabbed respondent by the handcuffs and brought him to his feet. As a result of the incident, one of respondent's teeth was knocked out, another was fractured and later removed, and he received lacerations requiring sutures on his right eyebrow and lip.

Moran testified that he remained in the car during the incidents, that the officer struck respondent three to four times, and that the officer then pushed respondent against the side of the police car, causing respondent to fall down. Moran was eventually released, and no charges were brought against him.

### Larson Was Not A "Prisoner" As Defined In Government Code Section 844.6 When The Alleged Assault And Battery Occured.

The liability sections of the Government Code involved here are:

1. Section 810: "Unless the provision or context otherwise requires, the definitions contained in this part govern the construction of this division."

2. Section 844: "As used in this chapter, 'prisoner' includes an inmate of a prison, jail or penal or correctional facility."

3. Section 815: "Except as otherwise provided by statute: (a) a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person. (b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person."

4. Section 815.2: "(a) A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within

the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."

This general exception authorizes the instant suit, unless it in turn has been modified by Government Code section 844.6:

5. Section 844.6: "(a) Notwithstanding any other provision of this part, . . . a public entity is not liable for: (1) An injury proximately caused by any prisoner. (2) An injury to any prisoner. . . . (d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission. The public entity may but is not required to pay any judgment, compromise or settlement, or may but is not required to indemnify any public employee, in any case where the public entity is immune from liability under this section."

In the context of this case, it is apparent that the trial judge initially gave an expanded meaning to the word "prisoner" but in granting a new trial, was of the opinion that it was intended that the word should carry the more restricted and appropriate meaning given it in the law.

The rule of statutory construction as given in Civil Code section 13, is "Words and phrases are construed according to the context and the approved usage of the language; but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, . . . are to be construed according to such peculiar and appropriate meaning or definition." (Cf. Code Civ. Proc., § 16; Prob. Code, § 106.)

We review some definitions: "A 'prisoner' is a person deprived of his liberty by virtue of a judicial or other lawful process" (41 Am.Jur., p. 886, § 2); any person is a prisoner who is held in confinement against his will (*United States* v. *Curran,* 297 F. 946); "1. A person held in custody, captivity or a condition of forcible restraint, especially while on trial or serving a prison sentence" (American Heritage Dict. of the English Language (1969)); "1. One who is confined in a prison or whose liberty is forcibly restrained; one held in custody; a captive; specif., in law, a person confined in a prison by virtue of an order of arrest or of a legal committal . . ." (Brit. World Lang. Ed., Funk & Wagnalls Standard Dict.); "1. One who is kept in prison or in custody; *spec.,* one who is in custody as the result of a legal process, . . ." (The Oxford English Dictionary (1933)); "One held in confinement against his will" (3 Bouvier's Law Dict., 3d rev. (8th ed. 1914)).

The "peculiar and appropriate meaning in the law," we believe, which we are commanded to follow, is that of a person in jail or prison. The meaning of words may depend upon the company they keep. ■    Con-

struing the word "prisoner" according to the context of the provisions which follow it in this article of the Government Code, it is evident that the word "prisoner" was used in the narrow, technical sense, embracing those confined in a prison, jail, penal or correctional institution.

Turning to the other sections of the Government Code found in this chapter 3, headed "Police and Correctional Activities," we find that all of the sections deal with "prisoners" as confined persons: section 845.4, interfering with a prisoner's right of legal review; section 845.6, failing to obtain and furnish medical care for a prisoner; section 845.8, injuries caused by an escaping or escaped prisoner. By its recent amendment, section 845.8 draws the distinction between a "prisoner" and an arrested person: "Neither a public entity nor a public employee is liable for: . . . (1) An escaping or escaped prisoner; (2) An escaping or escaped arrested person; or (3) A person resisting arrest"; and in section 846, "Neither a public entity nor a public employee is liable for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody."

In *People* v. *White* (1960) 177 Cal.App.2d 383, 385 [2 Cal.Rptr. 202], after definitions of the word "prisoner" had been reviewed, the court stated, "Thus, the significance of the word 'prisoner' is not the manner of commitment, but rather the fact of a judicial commitment."[1] In the use of the word throughout the Penal Code, we have not ascertained any other use of the word, and none has been pointed out to us.

The reason for such specification in section 844 is found in disputes which have arisen in the enforcement of the penal statutes concerning escape, for instance. The fact that the Penal Code provides for taking prisoners to hospitals, or for work in road camps, does not expand the definition of "prisoner" but rather the categories of prisons or restraints on prisoners already in custody (cf., for instance, Pen. Code, §§ 4011, 4011.5, 4012, 4007 and 4011.6).

The statutes relative to the escape of *prisoners* define the term in its limited, technical sense. (*In re Culver, supra,* 69 Cal.2d 898, 900-901); and as the technical definition states, imprisonment implies judicial commitment. (*People* v. *Rodriguez, supra,* 222 Cal.App.2d 221, 225-227.)

In *Scruggs* v. *Haynes* (1967) 252 Cal.App.2d 256 [60 Cal.Rptr. 355] (hg. den.) the peace officer and the city were held liable for injuries inflicted in an assault and battery in making an arrest of a suspect. It was ineffectu-

---

[1]Quoted with approval in *People* v. *Rodriguez* (1963) 222 Cal.App.2d 221, 225 [34 Cal.Rptr. 907]; cf. *In re Culver* (1968) 69 Cal.2d 898, 900 [73 Cal.Rptr. 393, 447 P.2d 633]; *People* v. *Handley* (1970) 11 Cal.App.3d 277 [89 Cal.Rptr. 656] (no pet. filed).

ally asserted that Government Code sections 815.2 and 820.2, granting immunity for discretionary action, were in bar of the suit. It perhaps is significant that no claim was raised nor suggested by the court that section 844, defining "prisoner," embraced the plaintiff, a resisting person, neither handcuffed nor arrested.

We thus do not discern in the subject matter, the context, nor in its appropriate and legal sense, any legislative intention to extend the definition of "prisoner" to include a person detained by the police but not arrested, or arrested and not booked. It clearly was not intended to embrace persons detained by law officers temporarily for purposes of investigation. (See *People* v. *Manis* (1969) 268 Cal.App.2d 653, 658-659 [74 Cal.Rptr. 423]; *People* v. *Gibson* (1963) 220 Cal.App.2d 15, 21 [33 Cal.Rptr. 775].)

Appellants rely upon *Datil* v. *City of Los Angeles* (1968) 263 Cal.App. 2d 655 [69 Cal.Rptr. 788]. In that instance, two persons had been arrested; were at jail and had been booked though no arraignment had been had nor plea taken; at which time one of them fatally assaulted the other. (Cf. *Bryant* v. *County of Monterey* (1954) 125 Cal.App.2d 470 [270 P.2d 897].) No tortious act or omission of any police officer was involved directly, and upon trial, no negligence of the city was shown. This latter fact was enough to decide the case. Under the extreme facts of the case, it was held that the parties involved were "prisoners" under a liberal definition of the term. Incarceration had begun. Though the court gave an enlarged definition to the term "prisoner" it would appear this was not contested by the parties.

In the present case, the policeman involved testified he had not yet arrested plaintiff at the time of the incident giving rise to this suit. The city argues that legally plaintiff was arrested, being under restraint. The arrest, if indeed it was, is far less than the arrests and bookings which had placed the participants in the jail premises in *Datil* v. *City of Los Angeles, supra.*

We believe that in specifying what the term "prisoner" *includes,* in context, that which is not included is *excluded.* (*In re Martinez* (1942) 56 Cal. App.2d 473, 477 [132 P.2d 901].) There are cases wherein an inclusion has been held not to limit a broader application of the basic term. They rest, we believe, on the circumstances and context in each case; and do not establish any general rule.

Had it been the intention of the Legislature to construe "prisoner" as broadly as the expansive, nontechnical definitions permit, and as appellant city contends, there would have been no necessity to adopt the definition in Government Code section 844 at all.

In connection with governmental tort immunities, the Supreme Court

has announced that liability is the rule, immunity is the exception. (*Johnson* v. *City of Pacifica* (1970) 4 Cal.App.3d 82, 85, 89 [84 Cal.Rptr. 246].) As such an exception the Legislature has adopted a general rule of liability. The exception to the exception, now embodied in Government Code section 844.6, subdivision (a), subsection (2), was intended to state in statutory form the immunities the courts had extended under the governmental function doctrine.[2] It is significant, perhaps, that the rule where immunities are concerned is for strict construction; not for judicial definition, to enlarge immunities.

We have noted the legislative distinction made in Government Code section 845.8 between a "prisoner" and an "arrested person." This cause significantly differs from *Datil* v. *City of Los Angeles, supra;* and makes pertinent *Scruggs* v. *Haynes, supra,* 252 Cal.App.2d 256.

Therefore, it was not only within his discretion but was the duty of the trial judge to grant the motion for new trial, so far as the application of Government Code section 844.6 is concerned.

The order granting a new trial is affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

---

[2] In California case law, attention was directed to the liability for injuries to prisoners primarily by *Fernelius* v. *Pierce* (1943) 22 Cal.2d 226 [138 P.2d 12], in which superiors were held liable for injuries to a prisoner injured by an officer whom it was held they retained, though knowingly of an ugly disposition. That was a City of Oakland case.

The general common law immunity for injury to, and inflicted by, prisoners was well established. Compare, *Oppenheimer* v. *City of Los Angeles* (1951) 104 Cal.App.2d 545, 548 [232 P.2d 26]; *Wood* v. *Cox* (1935) 10 Cal.App.2d 652 [52 P.2d 565]; *Abrahamson* v. *City of Ceres* (1949) 90 Cal.App.2d 523 [203 P.2d 98]; 18 McQuillin, Municipal Corporations (3d rev. ed. 1963), pages 338-344.