[No. S021885. Apr. 30, 1992.]

ELIZABETH BURDEN, Plaintiff and Respondent, v.
DAVID SNOWDEN, as Chief of Police, etc., et al., Defendants and
Appellants.

## COUNSEL

Thomas Kathe, City Attorney, Filarsky & Watt, Steve A. Filarsky, Pillsbury, Madison & Sutro, Amy D. Hogue and Kevin M. Fong for Defendants and Appellants.

Mayer & Reeves, Thomas M. Reeves, Irving Berger, Martin J. Mayer, Whitmore, Johnson & Bolanos, Richard S. Whitmore, Craig W. Patenaude and Helene L. Leichter as Amici Curiae on behalf of Defendants and Appellants.

John K. York and Celinda Tabucchi for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—We granted review in this case to determine the narrow issue whether a person hired by a city police department as a "police recruit" is entitled to coverage under the Public Safety Officers Procedural Bill of Rights Act (hereafter the Bill of Rights Act or the Act) (Gov. Code, § 3300 et seq.).[1] Our examination of the legislative scheme, its history and extrinsic aids leads us to conclude that the Act was not intended to apply to the recruit classification; therefore, a recruit is not entitled to coverage under the Act. Accordingly, we reverse the judgment of the Court of Appeal with directions to vacate the order of the trial court granting a writ of mandate and to remand the case to that court for proceedings consistent with this opinion.

---

[1] Unless otherwise indicated, all further statutory references are to the Government Code.

FACTS

In February 1988, the Costa Mesa Police Department (hereafter the Department) hired Elizabeth Burden (hereafter Burden) as a police recruit. From the outset, the Department made clear it was hiring Burden as a civilian, not as a police officer. The Department's job recruitment flyer specifically provided: "The Police Recruit position is a non-sworn position performing civilian police training work while attending a P.O.S.T. [Peace Officers Standards and Training] certified basic academy. Upon successful completion of the basic academy, Police Recruits are sworn in as full-time Police Officers."[2] Burden also signed a "Police Officer Trainee Advisement Form" which reflected her acknowledgement that she would not represent herself as a peace officer at any time, that she would not be a peace officer until she successfully completed the police academy, and that she would take no action as a peace officer or "in any other way attempt to use Peace Officer powers." The form further provided: "Due to the untimely starting of the police academy we were not able to complete your background, therefore your background will be completed while you are attending the academy. If for some reason you fail to pass your background and or medical, you will be terminated immediately."

Burden was directed to report to the Orange County Sheriff's Academy for 19 weeks of training on a full-time basis. During the time she attended the academy she was paid a flat hourly rate of $10.02 by the Department. Although Burden was not issued a police identification number or badge, she was issued a uniform with a hat piece identifying her as a recruit, a gun, ammunition, a baton and handcuffs.

As part of its standard screening process, the Department conducted a background investigation of Burden. Burden signed a "Release and Waiver" which authorized the Department to obtain any information in the files of her former employers and physicians. The release and waiver additionally provided: "I further understand that I waive any right or opportunity to read or review any background investigation report prepared by the Costa Mesa

[2]The Department consistently refers to the term "sworn" in describing the status of police officers and their duties, and to the term "non-sworn" in describing recruits and their duties. However, Burden points out the record contains no evidence of any oath used to specifically swear in police officers, and contends that article XX, section 3 of the California Constitution would prohibit any oath other than the oath of allegiance required for all public employees. Since the Department is not taking the position that Burden's failure to be sworn in specifically as a police officer, standing alone, is what precludes her from coverage under the Bill of Rights Act, we attach no significance to the Department's "sworn/non-sworn" terminology. As will be demonstrated, however, we are persuaded that material distinctions otherwise exist between police officers and recruits.

Police Department." Burden also signed an "Authorization Form" directed to her previous employer, the Honolulu Police Department, authorizing the release of any and all information for the limited purpose of aiding the Department in evaluating Burden's qualifications as a police recruit. Among other things, the form contained the following statement of understanding: "I understand that I will not receive and am not entitled to know the contents of confidential reports received from these agencies and I further understand that these reports are privileged."

Following receipt of the information from the Honolulu investigation, the Department terminated Burden for "failure to meet standards of a police officer."[3] This occurred during her 15th week at the training academy. Burden finished the remaining four weeks of the academy at her own expense, and subsequently applied without success to four other police departments. These other departments apparently also required Burden to sign release and waiver forms as part of their background investigations.

Through counsel, Burden eventually asked the Department for more specific information concerning the stated grounds for her termination. According to Burden's counsel, Chief of Police David Snowden informed him that Burden had committed "acts, while employed as a Honolulu Police Officer, which preclude her from ever working in law enforcement." No further information was provided.

Burden ultimately filed a claim against the City of Costa Mesa (hereafter the City). Thereafter she filed a mandamus petition in the superior court against the City, the Department and the police chief. Claiming that she was hired as a "public safety officer," Burden contended that the Department breached duties owed to her under the Bill of Rights Act (§ 3300 et seq.), and that her dismissal without notice and a pretermination hearing resulted in a deprivation of a liberty interest under the due process clause of the federal Constitution. The petition sought reinstatement, notice of the specific allegations which caused Burden's termination, an opportunity to respond, a hearing and a redetermination of the decision to terminate her.

The trial court determined that Burden was a public safety officer within the meaning of the Bill of Rights Act and that the Department's attempt to draw a distinction between police officers and recruits was not a valid one. The court further found that Burden's purported waivers of the right to see the results of her background investigation were unenforceable. Believing

---

[3]The record includes a "Personnel Action Form" which reflects this action, as well as Burden's personnel record which contains the entry "Failed Standards."

Burden was entitled to the Act's protections, the trial court granted her petition.[4]

The Court of Appeal affirmed, rejecting the Department's argument that police recruits are not public safety officers within the meaning of the Act. It also agreed that Burden's waivers were unenforceable. Finally, the court determined that because Burden's termination stigmatized her reputation and affected her ability to earn a living, it was punitive in nature and entitled Burden to an administrative appeal under provisions of the Act.

DISCUSSION

I. *The Bill of Rights Act.*

The Bill of Rights Act establishes certain procedural rights and protections for public safety officers. Among other things, the Act assures a public safety officer the right to an administrative appeal when any punitive action is taken against the officer. (§ 3304, subd. (b).)[5] The Act also affords a public safety officer the opportunity to review and sign any instrument containing any adverse comment before the instrument is entered in the officer's personnel file. (§ 3305.)[6] It further gives the affected officer 30 days to respond in writing to any adverse comment placed in the file. (§ 3306.)[7]

The central issue is whether Burden is a "public safety officer" within the meaning of the Bill of Rights Act. The Department contends that because it hired Burden as a "police recruit" (referring to a candidate for a

---

[4]Because it found the Bill of Rights Act applicable to Burden, the trial court deemed it unnecessary to determine whether she was also entitled to relief as part of her liberty interest under the due process clause of the federal Constitution. The court reserved jurisdiction to later determine issues of backpay, sanctions and recovery of attorney fees.

[5]Section 3304, subdivision (b) provides: "No punitive action, nor denial of promotion on grounds other than merit, shall be undertaken by any public agency without providing the public safety officer with an opportunity for administrative appeal."

[6]Section 3305 provides: "No public safety officer shall have any comment adverse to his interest entered in his personnel file, or any other file used for any personnel purposes by his employer, without the public safety officer having first read and signed the instrument containing the adverse comment indicating he is aware of such comment, except that such entry may be made if after reading such instrument the public safety officer refuses to sign it. Should a public safety officer refuse to sign, that fact shall be noted on that document, and signed or initialed by such officer."

[7]Section 3306 provides: "A public safety officer shall have 30 days within which to file a written response to any adverse comment entered in his personnel file. Such written response shall be attached to, and shall accompany, the adverse comment."

police officer position who has not yet completed a training academy and who is not authorized to use peace officer powers), and not as a "police officer," she is not a public safety officer as defined by the Act. Burden, on the other hand, contends that police recruits are encompassed by the Act's definition of "public safety officer," and that local agencies may not defeat application of the Act by classifying new hires as "recruits" instead of "police officers." Both the trial court and the Court of Appeal below held that the Act was intended to cover police recruits. For the reasons set forth below, we conclude otherwise.

■ In determining the scope of coverage under the Act, we independently determine the proper interpretation of the statute. As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856]; *Los Angeles County Safety Police Assn. v. County of Los Angeles* (1987) 192 Cal.App.3d 1378, 1384 [237 Cal.Rptr. 920].)

■ The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 208 [271 Cal.Rptr. 191, 793 P.2d 524]; *California Teachers Assn. v. San Diego Community College Dist., supra,* 28 Cal.3d at p. 698.) "In determining intent, we look first to the language of the statute, giving effect to its 'plain meaning.' " (*Kimmel, supra,* 51 Cal.3d at pp. 208-209, citing *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218-219 [188 Cal.Rptr. 115, 655 P.2d 317]; *California Teachers Assn., supra,* 28 Cal.3d at p. 698.) Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. (*California Teachers Assn., supra,* 28 Cal.3d at p. 698.) Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*Ibid.*)

■ During all relevant times herein, the Bill of Rights Act provided: "For purposes of this chapter, the term public safety officer means all peace officers specified in Sections 830.1, 830.2, 830.3, 830.31 except subdivision (f), 830.4 except subdivision (f), and 830.5 of the Penal Code." (§ 3301.)[8] Penal Code section 830.1 is the only enumerated section of relevance to this

---

[8]In 1989 and 1990, section 3301 was amended to specify additional Penal Code sections within its ambit. (Stats. 1989, ch. 1165, § 5; Stats. 1990, ch. 675, § 1.)

case. When Burden was terminated in June 1988, Penal Code section 830.1 specified that "any police officer of a city" is a peace officer.[9]

Applying the foregoing rules of statutory construction, we observe that the recruit classification is not one which is specifically covered by the Act. The Act, by its own terms, defines public safety officers to mean only those peace officers referred to in certain enumerated sections of the Penal Code. Notably, the only Penal Code section relevant here provides that a peace officer includes "any police officer of a city," but contains no provision for the conferring of peace officer status upon a person appointed as a "police recruit" or "civilian trainee." (Pen. Code, § 830.1.)

Although Penal Code section 830.1 does not specify the recruit classification as a separate category of "peace officer," neither does it expressly exclude recruits. For this reason, Burden essentially takes the position that the term "any police officer of a city" is ambiguous and should be interpreted with reference to what she contends was the common meaning of the term "police officer" at the time the Bill of Rights Act was passed. Burden relies on the declarations of two 22-year veteran police officers, which set

[9]All of the Penal Code sections specified in section 3301 are contained in chapter 4.5 of part 2, title 3 of the Penal Code which defines "peace officers." In June 1988, Penal Code section 830 provided: "Any person who comes within the provisions of [chapter 4.5] and who otherwise meets all standards imposed by law on a peace officer is a peace officer, and notwithstanding any other provision of law, *no person other than those designated in this chapter is a peace officer*. The restriction of peace officer functions of any public officer or employee shall not affect his status for purposes of retirement." (Italics added.)

In 1988, Penal Code section 830.1, subdivision (a) designated the following classifications: "Any sheriff, undersheriff, or deputy sheriff, regularly employed and paid as such, of a county, *any police officer of a city*, any police officer of a district (including police officers of the San Diego Unified Port District Harbor Police) authorized by statute to maintain a police department, any marshal or deputy marshal of a municipal court, any constable or deputy constable, regularly employed and paid as such, of a judicial district, or any inspector or investigator regularly employed and paid as such in the office of a district attorney, *is a peace officer*. . . ." (Italics added.)

In 1990, an amendment to Penal Code section 830.1, subdivision (a) revised, inter alia, the designation of "any police officer of a city" to "any police officer, employed in that capacity and appointed by the chief of police or the chief executive of the agency, of a city." (Stats. 1990, ch. 1695, § 9.) The Department invites us to apply this amendment on the basis that *Hays* v. *Wood* (1979) 25 Cal.3d 772, 782 [160 Cal.Rptr. 102, 603 P.2d 19], compels application of current law because Burden is purporting to seek "relief in futuro." Alternatively, it urges the amendment merely clarifies existing law. However, even if we were to assume that the new language is dispositive of the issues here, *Hays* is inapplicable because Burden is not seeking injunctive relief directed to future acts. Moreover, the Legislature did not declare the amendment to apply retroactively, nor do the legislative materials provided by the Department support retroactive application of the amended language quoted above. (See *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434].) Rather, the materials concern another part of the 1990 amendment which purported to clarify existing law as it pertained to *reserve* officers.

forth their current recollections that in 1976, police departments throughout California commonly used the term "police officer" to refer to police recruits and trainees as well as sworn police officers.[10] According to these officers, such practice continued at least until 1982, at which time new policies were instituted whereby new personnel were assigned the classification of "police recruit," and then elevated to "police officer" upon completion of the training academy.

This argument is unpersuasive. The declarations of these two officers are not logically probative of the Legislature's intent in enacting the Bill of Rights Act. Indeed, a 1968 opinion of the California Attorney General gives rise to a presumption that the Legislature did not intend the Act to cover the recruit classification.

■ When construing a statute, we may presume that the Legislature acts with knowledge of the opinions of the Attorney General which affect the subject matter of proposed legislation. (*Cal. State Employees Assn.* v. *Trustees of Cal. State Colleges* (1965) 237 Cal.App.2d 530, 536 [47 Cal.Rptr. 73].) ■ Here it is significant that, before the Bill of Rights Act was enacted, a published opinion of the California Attorney General had concluded that "cadets" and "trainee officers" were not peace officers under former Penal Code section 817, the predecessor statute to Penal Code section 830 et seq.[11] The Attorney General wrote: "There is no provision in [Penal Code] section 817 for the conferring of peace officer status upon a person appointed as a 'cadet' or 'trainee officer.' Since the [L]egislature has expressly named those who are 'peace officers' and has failed to include the aforementioned classifications, and additionally, since the designation 'cadet' or 'trainee

---

[10]In the trial court, Burden submitted the declarations of Sergeant Jack Jansen of the Anaheim Police Department and Lieutenant Leo Tamisiea of the Office of the Chief of the Bay Area Rapid Transit District Police Department. Sergeant Jansen declared that in 1976, all new law enforcement personnel hired by the Anaheim Police Department were assigned the job title of "police officer" from the first day of employment; there was no special classification of "police officer recruit" for those personnel who had not completed the training academy. Sergeant Jansen stated that the department's policy changed in 1982, at which time new personnel were assigned the classification of "police recruit," and were then elevated to "police officer" upon completion of the training academy. Lieutenant Tamisiea, drawing from his experience as Chairman of the Peace Officers' Research Association of California, declared that the same was essentially true for "nearly all (if not all) law enforcement agencies in California."

[11]Penal Code, former section 817 provided in pertinent part: "A peace officer is the sheriff, undersheriff, deputy sheriff, coroner, deputy coroner, regularly employed and paid as such of a county, any qualified person, when deputized or appointed by the proper authority as a reserve or auxiliary sheriff or city policeman while performing police functions assigned to him by the appointing authority, . . . marshal, policeman of a city or town . . . ." (Stats. 1967, ch. 604, § 1, p. 1952.) In 1968, Penal Code section 817 was repealed (Stats. 1968, ch. 1222, § 58, p. 2322) and was replaced by Penal Code section 830 et seq. (Stats. 1968, ch. 1222, § 1, p. 2303).

officer' cannot be construed as being within the classification 'reserve' or 'auxiliary' sheriffs, we conclude that these persons are not peace officers within section 817." (51 Ops.Cal.Atty.Gen. 110, 112 (1968).)

Since the designation of peace officers in former Penal Code section 817 is not materially different from the designation in Penal Code section 830.1, subdivision (a) for purposes of making the cadet/trainee distinction,[12] the Legislature presumably acquiesced to the distinction when it subsequently enacted the Bill of Rights Act. (See *Tiffany* v. *Sierra Sands Unified School Dist.* (1980) 103 Cal.App.3d 218, 227 [162 Cal.Rptr. 669].)

Burden attempts to bolster her position by emphasizing that the Act encompasses a matter of statewide concern. She argues that the Department is improperly attempting to opt out of the legislation by simply "relabelling" a job title. This argument is without merit for two reasons.

To begin with, there is no evidence that the Department simply "relabels" job titles as among recruits and police officers for the purpose of avoiding the Act. Those appointed to the position of police officer are authorized to use the powers of a peace officer and to engage in active law enforcement. On the other hand, those appointed to the recruit position do not exercise such powers or functions; they are committed to attend the training academy on a full-time basis. There is no suggestion that the Department classifies any employee exercising peace officer authority as a recruit.[13] On this record, then, there exist real and meaningful distinctions between those classified as recruits and those classified as police officers.[14]

More significantly, the Department's appointment of police recruits and police officers is not a matter of statewide concern which is addressed by the Bill of Rights Act.

[12]The Court of Appeal concluded below that the Attorney General's 1968 opinion was inapplicable. It reasoned that, unlike police recruits such as Burden, the employees covered by that opinion were not "regularly employed and paid as such." We are not persuaded. The Attorney General did not determine that cadets and trainees were not peace officers because they were not regularly employed and paid. Rather, the Attorney General concluded quite specifically that cadets and trainee officers did not have peace officer status because there was no express provision in former Penal Code section 817 for such classifications. (See 51 Ops.Cal.Gen., *supra*, at pp. 110, 112.)

[13]Evidence in the record also indicates that recruits are treated in a category separate from police officers with regard to wages. Additionally, the Costa Mesa Police Association, by agreement with the City, represents various police officer classifications, but does not represent the recruit classification.

[14]Indeed, Burden is not claiming the Department hired her as a de facto police officer. She does not contend she was authorized to exercise peace officer powers or otherwise act as a police officer. In fact she signed a "Police Officer Trainee Advisement Form" specifically acknowledging that she would not. Aside from her written acknowledgments, Burden was not issued a police identification number or badge. The hat piece she was issued specifically identified her as a recruit.

■ "Although what constitutes a matter of statewide concern is ultimately an issue for the courts to decide, it is well settled that this court will accord 'great weight' to the Legislature's evaluation of this question. [Citation.]" (*Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874], fn. omitted [hereafter *Baggett*].) ■ The Legislature's evaluation in this instance is quite explicit: "The Legislature hereby finds and declares that the rights and protections provided to peace officers [by the Bill of Rights Act] constitute a matter of statewide concern. The Legislature further finds and declares that effective law enforcement depends upon the maintenance of stable employer-employee relations, between public safety employees and their employers. In order to assure that stable relations are continued throughout the state and to further assure that effective services are provided to all people of the state, it is necessary that this chapter be applicable to all public safety officers, as defined in this section, wherever situated within the State of California." (§ 3301.) Thus, the plain purpose of the Act is to assure the provision of effective law enforcement services throughout the state by maintaining stable employment relations between certain statutorily defined public safety officers and their employers.

In contrast, we have already recognized that the Bill of Rights Act is not intended to regulate or restrict the appointment of police officers by local law enforcement agencies. In *Baggett, supra,* we held that the home rule provisions of the California Constitution (Cal. Const., art. XI, § 5) do not preclude application of the Act to charter cities. In reaching that conclusion, we explained that the Act does not "purport to regulate [peace officers'] qualifications for employment," or " 'the manner in which,' or 'the method by which,' or 'the times at which,' " peace officers are elected or appointed. (*Baggett, supra,* 32 Cal.3d at p. 138.) Thus, the Act in no way impinges on the Department's ability to hire civilian recruits and to screen and train them before deeming them qualified to assume the position of "police officer."[15]

Burden next argues that if the legislative goal of eliminating labor unrest is to be achieved, the Bill of Rights Act would "logically cover" civilian

[15]State regulations require that every peace officer employed by a city police department or county sheriff's department shall serve in a probationary status for at least 12 months. (Cal. Code Regs., tit. 11, § 1004.) We note there are cases assuming or recognizing that a public safety officer includes a person who is appointed to a police officer or sheriff position, even though the person is in a probationary status. (E.g., *Gray* v. *City of Gustine* (1990) 224 Cal.App.3d 621 [273 Cal.Rptr. 730] [probationary police chief]; *Hanna* v. *City of Los Angeles* (1989) 212 Cal.App.3d 363 [260 Cal.Rptr. 782] [probationary police officer]; *Browning* v. *Block* (1985) 175 Cal.App.3d 423 [220 Cal.Rptr. 763] [probationary deputy sheriff]; *Swift* v. *County of Placer* (1984) 153 Cal.App.3d 209 [200 Cal.Rptr. 181] [probationary deputy sheriff]; *Barnes* v. *Personnel Department* (1978) 87 Cal.App.3d 502 [151 Cal.Rptr. 94] [probationary police officer].) These cases are inapposite since Burden was not hired as a police officer to begin with.

trainees as well as postacademy graduates. However, there is no indication the Legislature sought to eliminate labor unrest among all categories of employees hired by law enforcement agencies. On the contrary, section 3301 makes clear that the Legislature was specifically concerned with the assurance of effective law enforcement, and went only so far as to provide procedural protections for certain statutorily designated peace officers.

In this regard, we observed in *Baggett, supra,* that "it can hardly be disputed that the maintenance of stable employment relations between police officers and their employers is a matter of statewide concern. The consequences of a breakdown in such relations are not confined to a city's borders. These employees provide an essential service. Its absence would create a clear and present threat not only to the health, safety and welfare of the citizens of the city, but also to the hundreds, if not thousands, of nonresidents who daily visit there. Its effect would also be felt by the many nonresident owners of property and businesses located within the city's borders. . . . The inevitable result is that labor unrest and strikes produce consequences which extend far beyond local boundaries." (32 Cal.3d at pp. 139-140.)[16]

While labor unrest and work stoppage among police officers pose an obvious threat to the health, safety and welfare of the citizenry, it is doubtful that the same can be said in the case of police recruits. Police recruits such as Burden are not permitted to exercise peace officer authority or to otherwise act as police officers; instead, they attend a training academy on a full-time basis. And while it may be said that police recruits provide a pool from which police officers are ultimately selected, recruits are not immediately responsible for the public welfare. We therefore reject the notion that the Act must "logically cover" recruits and trainees in order to achieve the Act's goals.

Indeed, to judicially deem police recruits to be the equivalent of police officers, thus entitling them to the full panoply of protections under the Act, may even detract from effective law enforcement. Appointing new hires to the position of recruit offers local law enforcement agencies their first opportunity to quickly screen out those candidates who are unfit or unable to function as officers. It behooves cities, police departments, police officers, and most important, the public, to weed out these candidates at the earliest opportunity. Construing the term "police officer" to include recruits unnecessarily restricts local agencies from eliminating those candidates whose

---

[16]The Legislature explicitly stated its concern over such matters when it amended section 3301 in 1983. The legislation was described as "an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect." (Stats. 1983, ch. 964, § 3, p. 3464.)

background investigations and/or academy performance indicate their likely unsuitability as police officers.[17]

Burden raises two other arguments in support of her expansive interpretation of the Bill of Rights Act. First, she argues that the contents of related statutes show the Legislature's contemplation that recruits who have not completed the training academy are included in the definition of "peace officer." Second, she contends her position is supported by a 1980 opinion of the Attorney General. As demonstrated below, neither argument has merit.

First, Burden reasons that if the term "peace officer" is intended to refer only to graduates of the training academy, the effect of Penal Code section 832[18] would be to require "peace officers" who have already completed the training academy to complete the training academy. Burden argues such an interpretation would render Penal Code section 832 redundant and meaningless. We disagree.

In enacting Penal Code section 832, the Legislature expressly stated its intent to set forth minimum standards designed to "raise the level of competence of peace officers where necessary." (Stats. 1971, ch. 1504, § 3, p. 2975.)[19] We do not view the minimum standards contained in section 832 as suggesting any legislative intent to affirmatively confer peace officer status

---

[17]Indeed, governmental entities may be held vicariously liable for certain misconduct committed by police officers acting within the course and scope of employment. (E.g., *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202 [285 Cal.Rptr. 99, 814 P.2d 1341] [rape arising from misuse of official authority]; *Larson* v. *City of Oakland* (1971) 17 Cal.App.3d 91 [94 Cal.Rptr. 466] [assault and battery]; *Scruggs* v. *Haynes* (1967) 252 Cal.App.2d 256 [60 Cal.Rptr. 355] [assault and battery, use of unreasonable force].) Consequently, it is important for cities to be able to swiftly eliminate those candidates most likely to commit misconduct or exercise bad judgment.

[18]At the time Burden was hired, Penal Code section 832, subdivision (b) provided in pertinent part: "Every such peace officer described in this chapter, within 90 days following the date that he or she was first employed by any employing agency, shall, prior to the exercise of the powers of a peace officer, have satisfactorily completed [an introductory course of training prescribed by the Commission on Peace Officer Standards and Training]." (Stats. 1987, ch. 157, § 1, p. 1091.) In 1991, section 832 was amended to delete the requirement that the course be completed within 90 days of first employment and to add provisions relating to persons who do not become employed within three years from the date of passing the examination and persons who have had a three-year break in peace officer service. (Stats. 1991, ch. 509, § 2.)

[19]Section 1 of the Statutes of 1971, chapter 1504, pages 2974-2975, amended Government Code section 1031 which sets forth six minimum standards for peace officers. Section 2 thereof added section 832 to the Penal Code. Uncodified section 3 thereof provided: "It is the intent of the Legislature in enacting this act that the minimum standards described in Section 2 of this act shall be designed to raise the level of competence of peace officers where necessary and are not intended to supersede state or local law enforcement policy regarding the use of firearms or the exercise of powers to arrest."

upon those appointed to trainee positions. We likewise perceive no intent to preclude police departments from requiring an officer candidate to successfully complete academy training before being eligible for the position of police officer.[20]

Next, Burden argues her position is supported by an opinion of the Attorney General concerning the applicability of the Bill of Rights Act to sheriffs and police chiefs. (63 Ops.Cal.Atty.Gen. 829 (1980).) In concluding that sheriffs and police chiefs are covered by the Act, the Attorney General also determined that the Act applies to these and other peace officers even when the officers are unable to exercise peace officer authority for failure to meet the training or certificate requirements prescribed in Penal Code sections 832, 832.3, and 832.4. The Attorney General found that the training requirements are not a condition of employment, but a condition of the exercise of peace officer authority. He therefore concluded that "failure to meet those requirements or receive such a certificate by such a person may create an employer-employee relation of the type contemplated by the Legislature in enacting the act." (63 Ops.Cal.Atty.Gen., *supra*, at pp. 833-834.)

The Attorney General's opinion does not assist a person in Burden's position since it specifically refers to application of the Act to "a person employed in the position of a peace officer described in Penal Code section 830.1" and to any other peace officer "who would otherwise be included" in the Act. (63 Ops.Cal.Atty.Gen., *supra*, at p. 833.) We do not read the opinion as broadly calling for application of the Act to trainees who have not yet attained the position of police officer.[21] To do so would run contrary to our pronouncement in *Baggett, supra*, that the Act does not purport to regulate peace officers' qualifications for employment, or the manner in which, or the method by which, or the times at which, peace officers are elected or appointed. (*Baggett, supra*, 32 Cal.3d at p. 138.)

In sum, while the Bill of Rights Act is intended to provide procedural protections to police officers, it is not intended to regulate or restrict the appointment of police officers by city police departments. Consequently, a person hired by a police department as a recruit and not as a police officer is

---

[20]If anything, the scheme appears to contemplate that, to the extent a police department undertakes to appoint a trainee as a police officer, the trainee shall not exercise peace officer powers until he or she meets the minimum training requirements contained in Penal Code section 832.

[21]We also note the 1980 opinion does not acknowledge or distinguish the Attorney General's earlier position that cadets and trainee officers were not peace officers under former Penal Code section 817 (the predecessor statute to section 830 et seq.). (See 51 Ops.Cal.Atty.Gen., *supra*, at p. 110.)

not entitled to coverage under the Act where real and meaningful distinctions exist between those classifications. We therefore hold that Burden is not covered by the Act. Because we find the Act inapplicable, we need not and do not decide the other issues raised by the parties regarding interpretation of the Act's provisions, and Burden's purported waivers thereof.

## II. *Other Issues.*

Burden argues in her answer brief to the Department's brief on the merits that she is entitled to review her personnel file pursuant to the Public Records Act (§ 6250 et seq.), the Information Practices Act of 1977 (Civ. Code, § 1798 et seq.) and Labor Code section 1198.5. ▆ However, this is the first time in this lawsuit that she has asserted these statutes as grounds for relief. Since these issues are not properly before us, we do not reach them on the merits.

Additionally, in the proceedings before the trial court, Burden sought relief on the alternative basis that because her termination stigmatized her reputation and impaired her ability to earn a living in her chosen profession, she was entitled to notice and a name-clearing hearing as part of her liberty interest under the due process clause of the federal Constitution. Since the trial court found the Bill of Rights Act applicable to Burden, it deemed it unnecessary to determine whether she additionally had rights as part of her liberty interest. In affirming the trial court judgment, the Court of Appeal also failed to consider this matter.

As the issue of relief under the due process clause of the federal Constitution was not previously addressed by the courts below, we decline to consider it for the first time here. But because the issue has not yet been resolved in the trial court, the matter is remanded to allow that court to decide whether Burden is entitled to a writ of mandate on that ground.

### DISPOSITION

The judgment of the Court of Appeal is reversed with directions to vacate the order of the trial court granting a writ of mandate and to remand the case to that court for proceedings consistent with this opinion.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and George, J., concurred.

On May 28, 1992, the opinion was modified to read as printed above.