[No. H013230. Sixth Dist. Sept. 8, 1995.]

In re CRAIG CARR on Habeas Corpus.

**COUNSEL**

Daniel E. Lungren, Attorney General, Peter J. Siggins and James Petzke, Assistant Attorneys General, and George D. Prince, Deputy Attorney General, for Appellant.

Jeffrey M. Evans, under appointment by the Court of Appeal, for Respondent.

**OPINION**

**WUNDERLICH, J.—**

*Statement of the Case*

Annie Alexander, acting warden of the Correctional Training Facility at Soledad, appeals from an order of the trial court granting Craig Carr's petition for a writ of habeas corpus, vacating an order revoking his parole, and ordering his immediate discharge from custody. (Pen. Code, § 1507.[1]) She claims the court erred in concluding that the Department of Corrections (hereafter DOC) lost jurisdiction over Carr before it revoked his parole. We reverse the order.

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

*Facts*

On July 7, 1990, Carr was committed to the DOC for a three-year term. On November 19, 1991, Carr was placed on parole for the maximum statutory period of three years. (§ 3000, subd. (b)(1).) On November 18, 1992, after one year of continuous parole, the Parole Hearing Division (PHD) retained Carr on parole because of the seriousness of his offense and his repeated parole violations. One year later, on November 23, 1993, Carr was arrested for purse snatching and a parole hold was imposed.

On November 30, 1993, Carr's parole agent filed a report stating, among other things, that although Carr denied committing the offense, all information indicated otherwise.[2] On December 1, 1993, the agent recommended that Carr be retained on parole and the matter referred to the PHD screening calendar. On December 2, 1993, the agent's supervisor concurred. On December 6, 1993, Carr was returned to the custody of the DOC, where he remained pending further action on the alleged parole violation. A hearing was ultimately scheduled for December 29, 1993. At that time, parole was revoked and Carr remanded to custody for a 12-month term.

*Applicable Statutes*

Section 3000, subdivision (b)(1) (former § 3000, subd. (a)), provides, in relevant part, that "[a]t the expiration of a term of imprisonment . . . imposed pursuant to Section 1170 . . . , the inmate shall be released on parole for a period not exceeding three years, unless the parole authority for good cause waives parole and discharges the inmate from custody of the department."

Section 3001, subdivision (a) (hereafter section 3001(a)), provides, in relevant part, that when a person who was not imprisoned for a "violent felony" (see § 667.5, subd. (c)) "has been on parole continuously for one year since release from confinement, within 30 days, that person shall be discharged from parole, unless the [PHD] determines, for good cause, that the person will be retained on parole."[3]

---

[2]In her report, the agent explained that the victim said the perpetrator dropped his wallet while fleeing after the incident. All identification in the wallet belonged to Carr. Moreover, the victim said Carr's vehicle matched that of the perpetrator. Other witnesses said the perpetrator was in a white vehicle. Carr possessed a white vehicle.

[3]Section 3001(a) also provides that if a person who was imprisoned for a "violent felony" has been on parole continuously for two years since release from confinement, within thirty

Section 3001, subdivision (c) (hereafter section 3001(c)), provides, "In the event of a retention on parole, the parolee shall be entitled to a review by the parole authority each year thereafter until the maximum statutory period of parole has expired."

### The Ruling Below

The trial court noted that although the PHD properly acted to retain Carr on parole after he completed his first year, it did not do so again within thirty days after Carr completed his second continuous year, i.e. by December 19, 1993. Consequently, the court found Carr's parole terminated by operation of law on that date. Thus, on December 29, 1993, the PHD lacked jurisdiction to revoke Carr's parole.

### Discharge From Parole Under Section 3001(a)

We first describe the procedures governing review of a parolee's status within one month after the first year of continuous parole. As noted above, section 3001(a) mandates discharge at this time unless the PHD finds good cause to retain the parolee.

The administrative regulations adopted by the Director of the DOC (see § 5058) governing parole require performance of a "discharge review" within a month after the first year of continuous parole. (Tit. 15, Cal. Code of Regs., art. 7, [hereafter Regulations], § 3901.13.1, subd. (b)(1).)

When a parolee is *retained* after this "discharge review," the Regulations require service of a written copy of the PHD's decision and permit the parolee to appeal. (Regs., § 3901.13.1, subd. (c); see section 3001(a).)

The Operations Manual (hereafter OM) for the DOC reflects the actual practices of the PHD. It requires that a "Discharge Review Report" be prepared at least 20 days before the end of a parolee's first year of continuous parole. (OM, § 81080.1.1.) In this report, the parole agent reviews relevant information and recommends discharge from or retention on parole. (OM, § 81080.1.2.) The report must then go to a unit supervisor, who decides to discharge or retain.

If the supervisor decides to discharge, the review process ends and discharge becomes effective "30 days following completion of one year of

---

days that person shall be discharged from parole unless for good cause the PHD determines to retain him or her on parole.

Unless otherwise specified, the term "parolee" in this opinion refers exclusively to persons on parole who had not been imprisoned for a "violent felony."

continuous parole," and the "[p]arolee will discharge *by action of law* on date specified." (OM, § 81080.1.2, italics added; see OM, § 81081.1.1 ["By law" a parolee is discharged if the PHD does not order retention within 30 days after first continuous year on parole.].) However, if the parole agent's report or the unit supervisor recommends retention, the matter is submitted to the parole administrator for a decision, which again must be made within the 30-day period. *(Ibid.)*

■  In our view, section 3001(a), the pertinent Regulations, and the practice of the PHD as reflected in the OM indicate that parole for a parolee terminates by operation of law after the 13th month of parole unless the PHD takes action to retain the parolee. In *In re Nesper* (1990) 217 Cal.App.3d 872, 876 [266 Cal.Rptr. 113], the court so held.[4]

■  Appellant accepts *Nesper* but claims the trial court erred in concluding that the "discharge-by-operation-of-law provision" in section 3001(a) applies to annual reviews under section 3001(c). We agree.

*Annual Review under Section 3001(c)*

When a parolee is retained after a continuous year on parole, he or she remains subject to the term of parole initially imposed, here three years. Section 3001(c), however, provides that the parolee is "entitled" to an annual review. Clearly, this provision recognizes the PHD's authority to discharge a parolee after the first year of continuous parole but before the maximum three-year parole period has expired. (See Regs., § 3901.13.2 [the PHD may grant early discharge on its own motion].) However, the language of section 3001(c) does not itself reasonably suggest that the mandatory discharge provision in section 3001(a) applies in the context of an annual review. Nor does it necessarily do so when read together with section 3001(a). On the contrary, taken together, the unequivocal mandatory discharge language in section 3001(a), the absence of similar language in section 3001(c), and that

---

[4]In *People* v. *Lara* (1988) 206 Cal.App.3d 1297, 1302 [254 Cal.Rptr. 360], the court, citing *In re Welch* (1987) 190 Cal.App.3d 407, 411 [235 Cal.Rptr. 470], stated, "It is clear from a fair reading of [section 3001(a)] that that statutory provision does not contemplate the automatic termination of parole terms, under any circumstances. Rather, [this section] places a mandatory duty on [authorities] to affirmatively act either to continue or to terminate the parole status of parolees who have been *actually free of confinement for a continuous year,* irrespective of when such freedom from imprisonment *should* have occurred." (Italics in original.) The *Nesper* court agreed with this statement, concluding that when a parolee has in fact been free of confinement for a continuous year, then parole terminates unless the authorities affirmatively act to retain him or her. (*In re Nesper, supra,* 217 Cal.App.3d at p. 876.) We agree with *Nesper* and do not believe the PHD can maintain indefinite jurisdiction over a parolee after the 13th continuous month of parole simply by failing or refusing to act within the period set by statute.

section's lack of reference to section 3001(a) suggest the opposite: parole does not terminate by operation of law under section 3001(c).

This conclusion flows from and promotes the legislative intent behind the parole statutes. In section 3000(a)(1), the Legislature found and declared ". . . the period *immediately* following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. It is in the interest of public safety for the state to provide for the supervision of and surveillance of parolees, including the judicious use of revocation actions, and to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge." (Italics added.)

Read together section 3001(a) and (c) reflect a graduated approach toward discharge from parole. To encourage a parolee to properly and appropriately reenter, acclimate to, and behave in society during the first, critical year after release from prison, the Legislature in section 3001(a) provides a compelling incentive: mandatory discharge by operation of law unless the PHD can establish good cause to retain them on parole. When a parolee has been so retained, however, the Legislature in section 3001(c) still provides an incentive to encourage appropriate adjustment during successive years: annual review of one's parole status and the possibility of discharge. The absence of mandatory language in this section indicates that a previous finding of good cause and the need for a longer parole period warrant greater care and deliberate action in discharging a parolee. In other words, discharge after an annual review should not occur by operation of law. Rather, in successive years, discharge from parole is entirely discretionary and parole will terminate only if upon review the PHD formally discharges the parolee or the maximum period of parole has expired. This view of the statutory scheme recognizes the importance of the initial period after release on parole and promotes the interests served by continued supervision of parolees.

Clearly, however, a parolee has rights that flow from the statutory entitlement to an annual review. Although the statute suggests that the parolee must request an annual review,[5] section 3901.13.1, subdivision (c), of the Regulations provides that "[i]f the [PHD] does not discharge the parolee [after the initial discharge review], it shall review the case annually thereafter until discharge."

---

[5]Section 3001(c) does not expressly impose a sua sponte duty on the PHD to annually review a parolee's status. It simply entitles parolees to such a review. "In its usual sense, to entitle is to give a right or legal title to. [Citation.] To qualify for; to furnish with proper grounds for seeking or claiming." (Black's Law Dict. (6th ed. 1990) p. 532; Webster's Third New Internat. Dict. (1981) p. 758.)

Although the Regulations do not explicitly prescribe separate procedures governing annual reviews, section 3901.13.1, subdivision (c), of the Regulations provides that "[s]ubsequent reviews shall be performed as provided in this section." Thus, DOC expects annual reviews to be conducted like initial discharge reviews. The OM confirms this and requires preparation of a "Discharge Review Report" not only before the end of a parolee's first year but also "at least 20 days prior to completion of each year of continuous parole thereafter." (OM, § 81080.1.1.) Moreover, the OM does not establish separate procedures for annual reviews.

■ The procedural identity between annual and initial discharge reviews indicates that (1) an annual review must be performed within a 30-day period after successive continuous years of parole, (2) the reviews are designed to produce a recommendation and decision to retain or discharge a parolee, (3) the PHD must give the parolee written notice of the decision, and (4) the parolee is entitled to appeal from a decision to retain him. (See Regs., § 3901.13.1.)

■ On the other hand, this purely *procedural* likeness is not the equivalent of a substantive legislative mandate that contemplates the termination of parole by operation of law. Indeed, nowhere do the Regulations expressly require discharge or suggest that parole terminates by operation of law during the period within which a discharge review, either initial or annual, is to be performed.[6] Moreover, given our discussion of the differences between section 3001(a) and (c), we decline to insert such a mandate into section 3001(c) to accomplish a purpose that does not reasonably appear necessary to effectuate the Legislature's intent. (See *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

By our discussion, we do not mean to suggest that a parolee has no right to be released from parole after an annual review. As noted above, the purpose and procedures governing annual reviews are designed to produce a recommendation *and decision* on retention or discharge. Certainly a parolee may assert rights afforded by the Regulations and compel the performance of duties in accordance with them. If this were not the case, then the statutory entitlement to an annual review would indeed be hollow and meaningless.

What we do conclude, however, is that section 3001(c) does not provide for termination of parole by operation of law. Thus, the 30-day period within which the Regulations require an annual review to be conducted is not a

---

[6]Although the OM does state that, under certain circumstances, discharge will occur by operation of law, the statements refer to the initial discharge review and thus the "law" being referred to is section 3001, subdivision (b)(1). (See OM, §§ 81080.1.1, 81080.1.2.)

limitation on the PHD's jurisdiction over the parolee. Rather, if a parolee has been retained on parole after his or her initial discharge review, the PHD retains jurisdiction during the period for which the parolee was initially released unless and until the PHD discharges the parolee or the maximum parole period has expired without formal extension.

We note that in concluding the PHD had to act before December 19, 1993, the trial court referred to regulations that govern the scheduling of revocation hearings. In particular, the court cited section 3901.21.4, subdivision (b)(12). It provides that the PHD may decide to extend a period of parole pending a revocation hearing. "This decision shall be used to retain jurisdiction when a parolee charged with a parole violation will discharge prior to a revocation hearing." (Regs., § 3901.21.4, subd. (b)(12).)

This section simply recognizes that there are circumstances in which parole will terminate by operation of law unless the PHD takes action. Thus, if the PHD does not retain a parolee within the 30-day period after his first year, parole terminates. Or, if one is charged with a parole violation, arrested during this 30-day period but before the period expires, then parole will terminate by operation of law unless the PHD acts. The PHD would also have to act if the maximum parole period would expire before a parole revocation hearing could be held.

This Regulation, however, does not suggest that parole terminates by operation of law 30 days after each successive year on parole unless the PHD acts to the contrary. Nor do we interpret it to have this meaning.

Given our discussion, it is clear that the trial court entertained an erroneous view of the law. Carr's parole did not terminate by operation of law on December 19, 1993, and the PHD did not lose jurisdiction over him on that date. Rather, it retained jurisdiction by reason of the three-year period of parole initially imposed. Therefore the PHD had jurisdiction to revoke parole on December 29, 1993.

■ Relying on *In re Nesper, supra,* 217 Cal.App.3d 872, Carr claims the failure to conduct an annual review within 30 days, or ever, as required by the Regulations violated his right to due process of law and caused parole to expire by operation of law. We disagree.

When Carr was arrested and a parole hold imposed, he immediately became subject to a different parole procedure: parole revocation proceedings. (See generally, Regs., §§ 3901.17.1-3901.27.12.) The hold and pending revocation proceedings, in effect, eliminated the purpose of an annual

review—to decide between discharge and retention—because the newer, immediate issue properly before the PHD became whether or not to *revoke* parole altogether. Thus, as long as the procedures governing parole holds and revocation were properly followed, they necessarily obviated the need for an annual review pending a revocation hearing.[7] Moreover, once parole was revoked, any right Carr previously may have had to an annual review after his second continuous year on parole became academic. Under the circumstances, therefore, we fail to see how the lack of an annual review in this case denied Carr any due process of law.

Even if we assume, for purposes of argument only, the failure to hold an annual review somehow denied Carr due process, Carr could not establish any prejudice. A denial of due process is reviewable under the *Chapman*[8] " 'harmless beyond a reasonable doubt' " standard of review. (*In re La Croix* (1974) 12 Cal.3d 146, 154 [115 Cal.Rptr. 344, 524 P.2d 816].)

In performing an annual review, the PHD must evaluate the parolee's adjustment on parole. (Regs., § 3901.13.1, subd. (a).) Among the factors indicating retention, is whether "[w]hile on parole the parolee has been involved in criminal activity even if that activity did not result in revocation of parole . . . ." (Regs., § 3901.13.1, subd. (d)(3).)

Here, at the time Carr claims the PHD should have conducted an annual review, he was properly in custody pending a parole revocation hearing based on a purse snatching. In light of the information available about the incident, the parole agent rejected Carr's claim of innocence and believed he committed the offense. The agent's supervisor concurred in the agent's recommendation. Under these circumstances, it is inconceivable that Carr would have nevertheless been discharged from parole pursuant to an annual review before a revocation hearing resolving the alleged violation.[9]

Moreover, even if we could somehow entertain a reasonable doubt concerning whether Carr would have been retained on parole after an annual review, the remedy would not be to nullify the PHD's decision to revoke parole. Clearly, the failure to hold an annual review does not implicate the substantive propriety of the parole revocation. Rather, the remedy would be to grant Carr the process he was due: an annual hearing. (See *In re Bowers* (1974) 40 Cal.App.3d 359, 362 [114 Cal.Rptr. 665]; cf., e.g., *In re Ruzicka* (1991) 230 Cal.App.3d 595, 601 [281 Cal.Rptr. 435].)

---

[7]Carr does not suggest his rights were violated during the parole revocation process.

[8]*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

[9]Since our discussion is for purposes of argument only, we indulge in the implicit but implausible assumption that the PHD would conduct an annual review before pending charges of a parole violation were resolved.

Carr's reliance on *In re Nesper, supra,* 217 Cal.App.3d 872 is misplaced. In *Nesper,* authorities properly performed an initial discharge review under section 3001(a) and retained Nesper *within* the 13th month after his release on parole. However, the PHD failed to provide Nesper with written notice of its decision and several months later revoked parole. The court concluded that the failure to provide notice denied Nesper due process and nullified the decision to retain him on parole. Thus, the PHD lacked jurisdiction over Nesper when it revoked parole.

*Nesper* is distinguishable and inapposite primarily because there the mandatory discharge provisions of section 3001(a) applied. Thus, the court could find that once the due process violation nullified the decision to retain Nesper, parole terminated as a matter of law.

We further note that other courts have disagreed with *Nesper* concerning whether a failure to provide notice of an otherwise timely decision to retain a parolee nullifies that decision and vitiates a subsequent revocation order. (See, e.g., *In re Roa* (1991) 1 Cal.App.4th 724, 728 [3 Cal.Rptr.2d 1]; *In re Ruzicka, supra,* 230 Cal.App.3d at p. 601.) Rather, since the failure to give notice prevented the parolee from appealing the decision, the appropriate remedy was simply to give the parolee notice of the PHD's written decision and permit him or her to pursue an appeal. (*In re Roa, supra,* 1 Cal.App.4th at p. 728.)

### Disposition

The orders granting Carr's petition for habeas corpus, vacating his parole revocation, and ordering his discharge from custody are reversed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.