Filed 10/3/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re LOGAN B., a Person Coming Under the Juvenile Court Law. | B270252 (Los Angeles County Super. Ct. No. CK68767) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. O.K. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County. Robin R. Kesler, Referee.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant O.K.

---

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part 2 of the Discussion, pages 15–20.

Andre F. F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant Cary B.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

O.K. (Mother) and Cary B. (Father) appeal from an order terminating parental rights under Welfare and Institutions Code section 366.26.[1]  Mother claims that the trial court erred in rejecting her argument that her son Logan would benefit sufficiently from continuing his relationship with her to satisfy the requirements of the parental relationship exception in section 336.26, subdivision (c)(1)(B)(i).[2]  She argues that the trial court improperly required her to prove a "compelling" reason why termination of her parental rights would be detrimental to Logan.  She also argues that she proved such a compelling reason despite Logan's testimony that he preferred adoption by his maternal cousin, who had been caring for him for nearly four years.  We reject both arguments and affirm.

## BACKGROUND

1.    **The Juvenile Court Proceedings and Mother's Relationship with Logan**

a.    ***The basis for juvenile court jurisdiction***

The Los Angeles County Department of Children and Family Services (Department) filed a juvenile dependency petition on September 16, 2011, after receiving

---

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

[2] Father does not present any separate arguments on appeal, but joins in Mother's arguments and on that basis seeks reinstatement of his parental rights in the event that Mother's appeal is successful.  Because we affirm the trial court's orders with respect to Mother, it is unnecessary to address Father's appeal.

a report that Logan's parents were seen smoking methamphetamine in Logan's presence. The caller also reported that Father was a member of a "Skin Head" gang and had been in and out of prison over the last 15 to 20 years. Logan was eight years old at the time.

The petition alleged that Logan's parents had engaged in domestic violence in his presence. The petition also referred to a prior dependency proceeding in 2007 resulting from alleged domestic violence, drug use, and sexual abuse by an acquaintance of the parents. Juvenile court jurisdiction was terminated in that earlier proceeding in 2009 following an order from the family law court granting Mother sole physical and legal custody of Logan.

The Department filed its jurisdiction and disposition report on October 27, 2011. The report summarized an interview with Logan during which he confirmed that he had witnessed domestic violence, including seeing Father injuring Mother by pushing her onto a bed and turning over a table that hit Logan. Logan reported that his parents got into fights and argued a lot. The report stated that Mother had a prior conviction for possession of a controlled substance and Father had prior convictions for burglary, possession of a controlled substance, and resisting an officer.

On November 23, 2011, Mother and Father pleaded no contest to an amended petition. The court ordered Logan placed with Mother under the Department's supervision and permitted monitored visits by Father. The court also ordered Father to complete a domestic violence program and ordered Mother to participate in counseling, including conjoint counseling with Logan.

**b.** ***Events leading to termination of Mother's reunification services and limited visitation rights***

On February 22, 2012, the Department reported to the court that Father had not provided any proof of participating in the court-ordered programs, but Mother was complying with the case plan and Logan was doing well. However, on May 21, 2012, the Department filed a supplemental petition pursuant to section 387 alleging that Mother had become homeless while Logan was hospitalized for mental health issues (diagnosed as a mood disorder) and Mother had been unreachable since May 14, 2012. Mother had

3

placed Logan with Logan's maternal cousin, Andre. The petition also alleged that Mother had been repeatedly late and occasionally had not shown up at Andre's house to take Logan to school as she had agreed to do. In addition, Mother had permitted Logan to have unmonitored contact with Father on Mother's Day. There was apparently an incident that day that led to Father's arrest.

On May 21, 2012, the court ordered Logan detained with Andre and permitted Mother unmonitored day visitation. At a continued hearing on the Department's section 387 petition on August 21, 2012, the court ordered Logan removed from Mother's custody and ordered the Department to assist Mother in finding housing.

Although the Department provided Mother with various housing assistance referrals, by February 4, 2013, Mother was still homeless and unemployed. She was not enrolled in any of the court-ordered individual counseling programs. Logan was still living with Andre. The court found that Mother was not in compliance with the case plan, and on March 8 appointed Andre as Logan's educational representative.

By August 20, 2013, Mother was still not enrolled in any of the court-ordered individual counseling programs and only occasionally participated in conjoint counseling with Logan. She was visiting Logan weekly. Andre reported that the visits appeared to go well. A Department social worker observed that Mother and Logan appeared to have a strong bond. Father had been in prison and his whereabouts were unknown.[3] The court terminated Father's reunification services and permitted Mother's unmonitored visits to continue.

In December 2013 Mother failed to return Logan to Andre after a church event. Logan remained with Mother from Sunday, December 15, 2013, until she returned him to school the next Tuesday, December 17. The visit violated the court's order permitting

---

[3] Father had apparently been incarcerated in Nevada following conviction on a charge of transporting a controlled substance.

4

overnight visits only with prior confirmation that Mother's roommates had "livescanned."**4**

Mother visited Logan in mid-January, but then did not visit again until April 18, 2014. At a review hearing on March 20, 2014, the Department reported that Mother had provided no proof of participation in individual counseling and had not engaged in conjoint counseling with Logan. Mother's participation in family preservation services had been erratic. The court found that Mother was not in compliance with the case plan and terminated her reunification services. The court continued the case for a permanency hearing under section 366.26.

Mother had several more visits with Logan over the next few months that went well and that Logan seemed to enjoy. Mother then failed to appear for a visit on June 4, 2014. On July 2, 2014, Mother had another scheduled visit. Andre and Logan arrived on time. When Mother failed to appear 45 minutes after the starting time, Logan had an emotional breakdown. Mother told the social worker that she had car problems and then did not get a cab because she thought the visit was to be canceled.

In October 2014 both Mother and Father filed petitions under section 388, seeking custody or reinstitution of reunification services based on alleged changed circumstances. The court denied both petitions without a hearing. Mother then filed a second section 388 petition on November 12, 2014, claiming that she had been participating in a domestic violence program and had been visiting Logan more frequently. The court set that petition for a hearing on January 14, 2015, along with a section 366.26 hearing.

In its report prior to the hearing, the Department stated that Mother had made only minimal efforts to address the issues that had led to the intervention of the Department and her involvement in the juvenile system. Despite the services that she had received, Mother had not gained any significant insight into how her behavior had harmed Logan and had put him at risk of further abuse and neglect. She remained in contact with Father

---

**4** "LiveScans" are the method that the Department uses to obtain criminal background checks. (*In re Darlene T.* (2008) 163 Cal.App.4th 929, 933, fn. 2.)

despite their history of drug use and domestic violence.  The Department recommended that her section 388 petition be denied.  The court accepted that recommendation and continued the section 366.26 hearing.[5]

In March 2015 Logan's court-appointed special advocate (CASA) reported to the court that Logan had come to a full understanding that it was in his best interest to live with Andre.  He realized his behavior deteriorated drastically after visits with Mother.  Logan said that Mother pressured him constantly to come home and told him she was sad without him.  Logan was exhausted after visits and did not want to see Mother frequently.

Prior to a hearing on June 5, 2015, the Department reported that Logan had said he had become " 'fed up' " with Mother's failure to " 'do what she was supposed to do after three years.' "  He thought that Mother was " 'putting lies into my head,' " which made him feel uncomfortable.  He did not want Mother calling him every night, and he said he was okay with just two visits a month.  He thought Mother was " 'selfish' " to want more visits.

Logan's CASA also filed a report on June 5, 2015.  The report reiterated that Logan's behavior deteriorated after his visits with Mother and stated that Logan wanted to see Mother only once or twice a month.  At the request of Logan's counsel, following the June 5th hearing the court ordered that Mother's visits be reduced to every other week with two telephone calls per week.  The court again continued the section 366.26 hearing.

### c.     *Logan's decision to request adoption*

In July 2014 Andre told the Department that she wanted to be Logan's legal guardian but was open to the possibility of adoption as an alternative plan.  The Department requested time to arrange a home adoption study for Andre.  That study was approved in October 2014.

Various reports filed by the Department and by Logan's CASA over the next year indicated that Logan wanted legal guardianship rather than adoption.  Prior to the

---

[5] Mother later filed a third section 388 petition, which the court denied without a hearing on May 22, 2015.

6

January 15, 2015 hearing, the Department reported that Logan and Mother had a strong bond and that Logan wanted his parents to " 'legally' " remain his. He wanted to continue his visits with Mother. Later that month, Logan told a social worker that he was concerned about Mother's feelings and did not want to upset her by being adopted.

At the hearing on January 14, 2015, Mother's and Logan's counsel requested a legal guardianship by Andre. They pointed out that Logan would be 12 years old by the time the adoption could be completed and at that time could legally object to the adoption.[6]

Prior to the June 5, 2015 hearing, the Department reported that Logan wanted to live with Andre under a legal guardianship. The report from Logan's CASA stated that Logan wanted "long term guardianship at this time with option for adoption open in the future." However, Logan wanted his "case to be closed to [the Department]," and if this cannot happen, Logan "is willing to be adopted."

However, by July 2015, Logan had changed his mind and wanted adoption. The Department submitted a report on July 21, 2015, stating that Andre informed a social worker on June 5 that Logan had told his attorney he wanted to proceed with adoption rather than legal guardianship. The social worker interviewed Logan on July 8, 2015, and Logan confirmed that he wanted to be adopted. He said that he understood that would mean his mother's parental rights would be terminated and Andre would be his parent. He indicated that he "is no longer worried about what his mother wants and wants to move forward with an adoption." Logan's CASA also filed a report dated July 21, 2015, confirming that Logan now wanted adoption and stating that the CASA had "no doubt" that adoption by Andre was in Logan's best interests.

2.     **The Section 366.26 Hearing**

The contested section 366.26 hearing took place on February 3 and 4, 2016. Logan testified in chambers.

---

[6] Section 366.26, subdivision (c)(1)(B)(ii) creates an exception to termination of parental rights based upon the objection of a child aged 12 or older.

On examination by Mother's counsel, Logan testified that, although he previously wanted to go back to live with Mother, "I live in a stable home now, and I would like to be adopted." He also recalled previously wanting Andre to be his legal guardian. However, he said that such an arrangement would "involve court in my life, and I don't want that." He wanted adoption "[s]o that I can live with Andre and just be in a stable home."

Logan testified that he understood there could be a type of legal guardianship that would not require court intervention. Nevertheless, he "just want[s] to be adopted." He also understood that adoption would terminate Mother's parental rights and that if that occurred there would be nothing he could do to see Mother until he was 18 if Andre said that he could not. But his "mind is set." "For the past few years I have been saying legal guardianship, adoption, or living with my mom, and now I am set on adoption." He testified that he would feel that way even if there were an option to live with Andre and still have a relationship with Mother and not have to deal with the courts.

Logan recalled the time when he was very upset after Mother did not show up for a visit, and then on the telephone Mother was able to calm him down. He acknowledged that Mother makes him "feel calmer sometimes," although Andre can calm him down also.

Logan testified that he would be disappointed and sad if he could not see Mother until he was 18. He said that he likes to see Mother and feels close to her. He enjoys their visits. They sculpt with clay, talk about school, eat snacks and draw. On a scale of one to ten for how upset he would be if he could not see Mother until he was 18, he would feel about "7.5."

On examination by his counsel, Logan testified that Andre and Chris (her fiancé) are the ones who go to parent-teacher conferences, take care of him when he is sick, take him to the doctor and dentist, and arrange his extracurricular activities. Logan confirmed that, despite all the questions he had been asked, he had not changed his mind and "still want[s] adoption."

8

Mother also testified. She talked about what she did with Logan when they had unsupervised visits. She testified about the affection that Logan shows, the love that they express to one another, the nicknames and special language that they use, and the interests that they share.

At the conclusion of the hearing, the Department argued for termination of parental rights and adoption by Andre. Logan's counsel joined in the Department's request, arguing that the record is clear that Logan loves his mother but it is equally clear that he wants to be adopted and wants a stable home.

**3.     The Trial Court's Findings**

The court observed that it was "obvious Logan loves his parents" and that "the parents love Logan." However, the court concluded that parental rights should be terminated.

The court found that Father failed to satisfy the first element of section 366.26, subdivision (c)(1)(B)(i) by failing to be consistent in his visits. Father made himself "unavailable through his incarcerations to be a part of Logan's life during periods of time."

With respect to Mother, the trial court noted that section 366.26, subdivision (c)(1)(B) "talks about finding a compelling reason for determining that termination would be detrimental." The court stated that it "can't get past the first sentence" in finding a compelling reason why termination would be detrimental to Logan.

The court observed that Logan is very articulate and seemed like a young man who had "weighed his options." Logan had considered adoption and legal guardianship and "now is set on adoption." The court found that Logan wanted stability and that a legal guardianship "does not foreclose possible future court involvement."

The court also found that Mother was not "fulfilling a parental role" with the two hours of monitored visitation that she had every other week. The court concluded that "she does the best she can with what she's been given," but noted that "her time has been restricted by her own actions." "One time or a few times" that Logan asked to be "soothed by her" during her visits was not sufficient to show a parental role.

9

The court found by clear and convincing evidence that Logan was adoptable and that no exceptions applied. The court therefore terminated parental rights and transferred Logan's care, custody, and control to the Department for adoptive planning.

**DISCUSSION**

**1.    The Trial Court Correctly Decided that Mother Was Required to Prove a Compelling Reason Why Termination of Parental Rights Would Be Detrimental to Logan**

Section 366.26 establishes a detailed procedure for terminating parental rights. Subdivision (c)(1) states that a prior order under section 361.5 terminating reunification services "shall constitute a sufficient basis for termination of parental rights." If the court determines under a "clear and convincing standard" that it is "likely the child will be adopted," the court "shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) The goal is to provide "stable, permanent homes" for children who are dependents of the juvenile court, and the first choice to achieve that goal is adoption. (§ 366.26, subd. (b); *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 (*Jasmine D.*).)

This procedure recognizes that "[b]y the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) Thus, to terminate parental rights under section 366.26, the court "need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250.) Under these circumstances, "the court shall terminate parental rights" unless certain exceptions apply. (§ 366.26, subd. (c)(1).)

Mother relies on the exception set forth in section 366.26, subdivision (c)(1)(B)(i). Together with the introductory language in subdivision (c)(1)(B), that subdivision states that an exception to termination of parental rights applies when: "(B) The court finds a compelling reason for determining that termination would be detrimental to the child due

10

to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

Mother argues that this exception requires a showing of only two factors: (1) regular visitation, and (2) that the child would benefit from continuing the relationship. She claims that the trial court impermissibly added a third factor by requiring her to prove that there was a "compelling reason" to find that termination of her parental rights would be detrimental to Logan. Because this argument raises an issue of statutory interpretation, we review it de novo. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 (*Snowden*).)

The objective of statutory interpretation is "to ascertain and effectuate legislative intent." (*Snowden*, *supra*, 2 Cal.4th at p. 562.) Mother correctly points out that the plain meaning of a statute is the best guide to determining legislative intent, and that the court may not vary the plain meaning to accomplish some other purpose. (*Ibid.*) However, Mother is wrong in claiming that proof of a "compelling reason" why termination of parental rights would be detrimental to the child is not within the plain meaning of the statute. To the contrary: That express statement appears in subdivision (c)(1)(B).

Mother argues that the Legislature's explanation that the "compelling reason" must be "due to" one of the circumstances identified in the specific subdivisions means that the presence of one of those circumstances automatically qualifies as a "compelling reason." But the statute does not say that, and her suggested interpretation is itself a gloss on the statutory language that is inconsistent with its plain meaning.

Mother's interpretation would make the phrase "compelling reason" surplusage. If the Legislature had intended that the presence of any of the enumerated circumstances would automatically be sufficient to preclude termination of parental rights, it had no reason to include the requirement of a "compelling reason" in the subdivision. It could have written subdivision (c)(1)(B) more simply to say that an exception precludes termination of parental rights when "[t]he court finds . . . one or more of the following circumstances." A statutory construction that makes some words surplusage is to be

11

avoided.  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387, 1397 (*Dyna-Med*).)

Mother's interpretation also would be inconsistent with subdivision (c)(1)(D), which requires that "[i]f the court finds that termination of parental rights would be *detrimental to the child*" pursuant to the exceptions identified in subdivision (c)(1)(B), "it shall state its reasons in writing or on the record."  (§ 366.26, subd. (c)(1)(D), italics added.)  If the presence of any of the specific circumstances identified in subdivision (c)(1)(B) were alone sufficient to preclude terminating parental rights, that subdivision could simply require the trial court to state in writing why it found the existence of the circumstance, not to explain the reasons why termination would be "detrimental to the child."  Inconsistency with subdivision (c)(1)(D) is another reason to reject Mother's interpretation.  (See *Dyna-Med*, *supra*, 43 Cal.3d at p. 1387 ["statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible"].) [7]

In addition to its inconsistency with the plain language of subdivision (c)(1)(B), Mother's interpretation would frustrate the purpose of the legislative scheme.  Under Mother's interpretation of section 366.26, subdivision (c)(1)(B)(i), a parent's showing of regular visits and some benefit to the child from continuing the parental relationship would be sufficient to preclude terminating parental rights, even if a court concludes that the statutory goal of providing the child with a "stable, permanent home" outweighs that benefit.  (§ 366.26, subd. (b).)  That would be inconsistent with the focus on the child's

---

[7] Mother also argues that if section 366.26, subdivision (c)(1)(B) requires that a parent prove a "compelling reason" to continue the parental relationship in addition to establishing the specific circumstances identified in the listed exceptions, then the objection to adoption of a child who is 12 or older would not necessarily be sufficient to preclude termination of parental rights under subdivision (c)(1)(B)(ii).  That subdivision is not before us, so we do not reach Mother's argument.  However, we note that the objection of a child older than 12 might create a barrier to a finding of adoptability under subdivision (c)(1).  (See Fam. Code, § 8602 ["The consent of a child, if over the age of 12 years, is necessary to the child's adoption"]; *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650.)

12

interest in a permanent placement at the section 366.26 hearing.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [§ 366.26 "must be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect"].)

The court in *Jasmine D.* reached the same conclusion.  (*Jasmine D.*, *supra*, 78 Cal.App.4th 1339.)  In that case, the court held that a parent must do more to establish the parental relationship exception than just show the existence of some benefit to continuing the parental relationship.  The court rejected the appellant's argument that section 366.26 did not require any weighing of the benefit of a continuing relationship against the benefits of adoption.[8]  (*Id.* at pp. 1347–1349.)  The court concluded that, when viewed in light of the "legislative preference for adoption when reunification efforts have failed," the parental relationship exception does not permit a parent to "derail" adoption simply by showing that the child would derive some benefit from continuing the parental relationship through visits.  (*Id.* at p. 1348.)  Rather, to establish the exception a parent must prove that the benefit of continuing a parental relationship outweighs the child's interest in the stability and permanence of adoption.

In analysis that directly contradicts Mother's statutory interpretation argument here, the court in *Jasmine D.* reasoned that the balancing test it endorsed was confirmed by the Legislature's decision to amend section 366.26 in 1998 to add the language requiring the court to find " 'a compelling reason for determining that termination would be detrimental to the child.' "  (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349, citing Stats. 1998, ch. 1054, § 36.6.)  The court concluded that this language "makes it plain that a parent may not claim entitlement to the [parental relationship exception] simply by demonstrating some benefit to the child from a continued relationship with the parent, or some detriment from termination of parental rights."  (*Ibid.*)  We agree with that conclusion and reject Mother's argument that establishing the circumstances identified in

---

[8] At the time, the parental relationship exception was codified at section 366.26, subdivision (c)(1)(A).  (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1343.)

section 366.26, subdivision (c)(1)(B)(i) alone is sufficient to preclude termination of parental rights even when no compelling reason to continue those rights is shown.

The court in *Jasmine D.* also explained that its interpretation of the parental relationship exception was consistent with a long line of cases construing that exception, beginning with *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*). (See *Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1348–1349.) Those cases all require the benefit from continuing a parental relationship to be weighed against the child's interest in adoption. (*Ibid.*) The court in *Jasmine D.* recognized that this standard " 'reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption.' " (*Id.* at pp. 1348–1349, quoting *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)[9]

The plain language of section 366.26, the purpose and the history of the statute, and prior case law all contradict Mother's statutory interpretation. We therefore reject it.

---

[9] Mother claims that she does not rely on a standard that would require only a showing of some benefit to continuing the parental relationship no matter how insignificant. Citing *Autumn H.*, *supra*, 27 Cal.App.4th at page 575, Mother argues that "some" benefit to the child would not suffice, and that the parent "must show the bond is a significant one." Mother's reliance on the *Autumn H.* standard for this argument actually undermines her statutory interpretation. As discussed above, the balancing of the benefit of the parental relationship against the benefit of adoption required under *Autumn H.* is essentially the same as the requirement in section 366.26, subdivision (c)(1)(B) that a parent must show a "compelling reason" to continue the parental relationship. (See *Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1348–1349.) Mother's argument that the "plain language" of section 366.26, subdivision (c)(1)(B)(i) requires *only* a showing that the "child would benefit" from continuing the parental relationship is inconsistent with the *Autumn H.* holding that the benefit of the relationship must be evaluated against the benefit the child would obtain through adoption.

14

**2.    Mother Failed to Prove that the Benefit of Continuing Her Relationship With Logan Outweighed the Benefit of Adoption\***

Mother acknowledges that she had the burden to prove that the parental relationship exception applied.  (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)  Different courts have applied slightly different standards of review in deciding appeals from trial court orders rejecting the applicability of the parental relationship exception.  Some courts have reviewed the trial court's findings under the substantial evidence standard; some courts have applied an abuse of discretion standard; and some courts have used a mixed standard, reviewing the trial court's factual findings on the issue of the existence of a beneficial parental relationship for substantial evidence and reviewing the trial court's weighing of the benefits of continuing the parental relationship under the abuse of discretion standard.  (See *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1300–1301 (*Noah G.*) [summarizing cases].)  We need not decide which specific standard to apply here, as Mother has failed to show error under any of those deferential standards.

**a.    *The trial court properly assessed Logan's expressed desire for adoption.***

As it was required to do, the trial court weighed Logan's testimony as to whether he preferred adoption by Andre or a permanent guardianship relationship.  (§ 366.26, subd. (h)(1) ["At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child"].)  This section does not make the child's wishes dispositive, but requires the court to consider the child's desires along with other factors in determining the course of action that will be in the child's "best interests."  Thus, the trial court here could not properly base its decision on Logan's expressed desire for adoption alone.  The record reflects that the trial court did not do so.  While the court carefully considered Logan's wish to be adopted, it evaluated that wish in the context of weighing the benefits of adoption against the benefit of Logan's relationship with Mother, as section 366.26 requires.

---

**\*** See footnote, *ante*, page 1.

The trial court also carefully evaluated whether Logan had made up his mind based upon an adequate understanding of the consequences of his decision. Logan testified consistently that he preferred adoption. He repeatedly said that he wanted the stability that adoption promised. The trial court concluded that Logan appeared to be a "young man that has weighed his options" and credited his desire for stability and permanence. Providing a stable and permanent home is precisely the value that section 366.26 is intended to protect. (§ 366.26, subd. (b).)

Mother argues that the trial court should have discounted Logan's testimony because it was based on mistaken factual assumptions. She claims that Logan was mistaken in thinking that (1) he could achieve stability and get the Department "out of his life" only through adoption and not through a permanent guardianship and (2) his visits with Mother would continue after adoption. The argument is unpersuasive for several reasons.

First, the argument disregards the trial court's role in assessing Logan's state of mind. We defer to the trial court's assessment of Logan's understanding and desires based upon his testimony and the trial record. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1335 (*Christopher L.*).) In *Christopher L.*, the court upheld the trial court's finding that the 14-year-old child in that case did not object to adoption despite his testimony that he would not want to be adopted if he could never see his mother again. The trial court was entitled to consider that testimony along with the child's other testimony and statements that he wished to be adopted and that he was happy living with his prospective adoptive parents. "It was the juvenile court's task to determine the testimony that accurately represented Christopher's state of mind with respect to adoption." (*Id.* at p. 1335.) Similarly, here, we defer to the trial court's assessment of Logan's wishes from the totality of his testimony and statements.

Second, the record does not show that Logan's assumptions were mistaken. Logan's belief that only adoption would ensure that his status would be permanent and free of additional Department involvement was both understandable and reasonable. A permanent guardianship would not preclude the possibility of a future motion or motions

16

by Mother under section 388 to regain custody. Indeed, Mother had already filed three such motions by the time Logan testified. While Mother speculates that she could not obtain a hearing on such a motion in the future without first demonstrating a "long history of housing stability and separation from Father," she does not deny that such a motion is possible and does not acknowledge the stress that the mere filing of such a motion could cause Logan.

The record also does not show that Logan misunderstood the possible effect of adoption on his ability to see Mother again. Logan testified that he understood that adoption would mean that he would have no ability to see Mother before he was 18 years old if Andre decided he could not. His testimony that he wanted his visits with Mother to continue and that he had made plans with Andre to continue them did not show that he was mistaken about Andre's ability to terminate those visits after adoption if she chose to do so. (See *Christopher L.*, *supra*, 143 Cal.App.4th at p. 1335 ["We . . . do not construe Christopher's wish to continue to see [his mother] as undermining or being contrary to his wish to be adopted by his aunt and uncle"].)

**b.** ***The trial court's weighing of the evidence concerning the benefits that Logan received from Mother's visits is supported by the record.***

The trial court stated that it "cannot find a detriment to Logan to terminate. I am looking at Logan's position here. And I must look at it through his eyes versus through the parents' eyes." That perspective was consistent with the focus on the child's best interest at a section 366.26 hearing. (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) The trial court's conclusion was also supported by evidence concerning the benefits of Mother's visits weighed against the benefits of adoption.

While Logan testified that he valued his visits with Mother, there was evidence that the visits were not always beneficial. By June 2015 Logan's CASA was reporting that Logan recognized "his behavior deteriorates drastically after visits with [Mother]. His grades drop and he has frequent 'meltdowns' for several days. He expressed that he is exhausted after her visits; he wants to see her infrequently (maybe once or twice per month) and he only wants to speak with her infrequently as well." Logan's therapist told

17

the CASA that Logan's "difficulties come after visits with [Mother]"; that the therapist was "very concerned about the pressure [Mother] puts on Logan"; and that the therapist agrees that Mother's "visits are quite destructive to Logan."[10]  Logan also told the Department around that same time that he thought Mother had lied to him and that "she has a habit of lying."  He said that Mother "didn't do what she was supposed to do after three years and now she is trying... I am fed up; she can't start being a mom now."  In June 2015 the court reduced Mother's visitation rights at Logan's request.

The trial court could reasonably weigh such evidence along with the beneficial aspects of Mother's visits in considering the value of the continued parental relationship.  The court could also consider Logan's own insights into the difficulties of his relationship with Mother in weighing his testimony that he preferred adoption.

Much of the evidence on which Mother relies concerns the positive aspects of Mother's visits with Logan.  The trial court heard that evidence and nevertheless concluded that the benefits that Logan received from those visits did not outweigh the interest of a permanent home through adoption.[11]  Mother cannot demonstrate error just by showing that Logan enjoyed some benefit from his relationship with her through their periodic visits.  "The juvenile court may reject the parent's claim simply by finding that the relationship maintained during visitation does not benefit the child significantly enough to outweigh the strong preference for adoption." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)  Because Mother had the burden to prove that the parental

---

[10] Mother argues that the absence of a report from Logan's therapist at the section 366.26 hearing supports an inference that the report would not have been favorable to the Department.  Whether or not the trial court could have drawn such an inference, it was not required to do so.  In light of the prior statements from the therapist mentioned above, the inference was questionable.  In any event, a vague inference from the *absence* of evidence does not meet Mother's burden on appeal of identifying uncontradicted evidence that "compels a finding" in her favor "as a matter of law."  (*I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*).)

[11] Both Logan and the trial court recognized that Mother's visits with Logan might not continue after adoption.  Mother's argument that Andre made efforts to "alienate" Logan from Mother is therefore irrelevant.

18

relationship exception applied, even uncontradicted evidence that her visits benefited Logan is not enough.  Mother must show that the evidence was " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.)  The evidence that Mother did not have a *parental* relationship with Logan, along with Logan's expressed desire for adoption, supported the trial court's judgment that adoption was the better course.

Similarly, Mother's speculation about the possible emotional consequences for Logan if her visits were to cease does not provide a reason to reverse the trial court's decision.  The record shows that Logan wanted the visits to continue and would be quite sad if they did not.  But that is not the same as a serious emotional problem resulting from a termination of the relationship.  Evidence that Logan was upset when Mother did not make it to a scheduled visit also does not necessarily mean that her visits were a requirement for Logan's mental health.  Such evidence could as easily be interpreted as an indication that Logan was upset with Mother's failure to meet a commitment.  Indeed, as discussed above, there was evidence that Mother's visits themselves sometimes had a negative effect.

The cases that Mother cites do not require reversal here.  Analysis of the circumstances affecting the parental relationship exception is fact-intensive.  "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond."  (*Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–576.)  Circumstances in the cases that Mother cites differed in significant ways from the circumstances in this case.

In *In re S.B.* (2008) 164 Cal.App.4th 289, the father immediately stopped his drug use when his five-year-old daughter was removed from his care and complied with every aspect of his case plan.  His daughter stated that she wanted to live with him, and the trial court terminated the father's parental rights in part based on the adoptive parents' unenforceable commitment to permit the father's visits to continue.  Here, in contrast, 12-year-old Logan was consistent in expressing a desire to be adopted, Mother failed to

comply with her case plan and court orders leading to limited, monitored visitation, and both Logan and the trial court recognized that her visits were not certain following adoption. Moreover, as noted in *Noah G.*, *supra*, 247 Cal.App.4th at pages 1302–1303, the same appellate court that decided *In re S.B.* has subsequently limited the case to its specific facts.

In *In re Scott B.* (2010) 188 Cal.App.4th 452, unlike here, the child repeatedly insisted that he wanted to live with his mother; his "CASA opined, and the record clearly show[ed]," that it would be detrimental to disrupt his relationship with his mother; and the trial court found that the mother filled a parental role. (*Id.* at pp. 468, 471–472.) And in *In re Amber M.* (2002) 103 Cal.App.4th 681, the seven-year-old child expressed conflicting wishes about where she wanted to live; the child's CASA and an expert psychologist testified about the importance of the bond between the child and her mother; and the appellate court had concerns about the "fragmented" hearing process and the basis for the trial court's ruling on the parental relationship exception. (*Id.* at pp. 687–691.) None of those factors is present here.

The trial court's ruling terminating parental rights in this case is solidly based on the record, and we therefore affirm.

## DISPOSITION

The juvenile court's order terminating parental rights pursuant to Welfare and Institutions Code section 366.26 is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.