Filed 2/2/21  In re H.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re H.R., a Person Coming Under the Juvenile Court Law. | |
| | D077991 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J518295) |
| Plaintiff and Respondent, | |
| v. | |
| M.P., | |
| Defendant and Appellant. | |


APPEAL from orders of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Senior Deputy County Counsel, for Plaintiff and Respondent.

M.P. (Mother) appeals from the order terminating her parental rights and selecting adoption as the permanent plan for her daughter, H.R. Mother contends that the juvenile court erred by terminating parental rights after finding that the beneficial parent-child relationship exception to adoption did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] She also challenges the juvenile court's actions to satisfy its duty of inquiry under the Federal Indian Child Welfare Act (ICWA). We conclude that the juvenile court did not err in making these rulings and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In May 2019, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b), on behalf of eight-year-old H.R. The Agency alleged that Mother was arrested with H.R. in her car, where the police also found drug paraphernalia.[3]

As discussed in the detention report, this proceeding was Mother's fifth dependency proceeding and the third proceeding involving H.R. This third proceeding began only weeks after Mother reunified with H.R. following the second proceeding. Mother and her boyfriend were stopped by law enforcement after they were observed fighting inside a car with H.R. in the back seat without a booster seat. A subsequent search revealed two pipes

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[3]    H.R.'s father was not involved in the proceedings below and did not appeal the termination of his parental rights. Accordingly, he is not discussed in this opinion.

with a usable quantity of methamphetamine, an empty pipe coated in white residue, and a loaded "replica style BB gun" within the reach of H.R. The report detailed Mother's long history of drug abuse and criminal arrests and convictions. Since being reunited with Mother, H.R. had missed many days of school. A social worker interviewed Mother, who claimed she had been sober since 2017 and that the information regarding the stop by law enforcement was false.

Based on this information, the juvenile court found that the Agency had made an adequate showing that H.R. was a person described by section 300, subdivision (b), and ordered her detained in out-of-home care.

In its initial jurisdiction report filed in June 2019, the Agency noted that H.R. was detained at Polinsky Children's Center. Since H.R.'s detention, Mother had been arrested on suspicion of first degree murder, but had been released as a "very important witness." When interviewed, H.R. told a social worker that she missed Mother, but stated that "I don't even feel like my mommy even loves me." H.R. explained that Mother's boyfriend was violent with Mother and H.R. and that she was often left alone while her Mother and boyfriend "smoke their drugs in the room." In a separate interview, Mother admitted to her drug use and opined that she could safely care for H.R. if she received help to overcome her substance abuse and escape the domestic violence.

In an addendum report, the Agency noted that Mother was not cooperating and had been arrested in Orange County. Based on Mother's extensive case history, the Agency recommended that Mother not be provided reunification services. In another addendum report, a social worker noted that H.R. was complaining that Mother was not contacting her. When the social worker explained to H.R. that the Agency was recommending that she

not be returned to Mother's care, H.R. indicated that she would like to remain with her current caregivers, but also cried when the social worker couldn't tell her that she would someday return to her Mother's care. By the time of the contested jurisdiction hearing in October 2019, Mother was still incarcerated in Orange County.

At the jurisdiction and disposition hearing, the court sustained the allegations of the petition under section 300, subdivision (b). The court found by clear and convincing evidence that Mother has "an extensive abusive and chronic use of drugs or alcohol" and had resisted prior treatment. Accordingly, pursuant to section 361.5, subdivision (b)(13), the court found that reunification would not be in the best interests of H.R. and denied reunification services for Mother. The court set the matter for a selection and implementation hearing pursuant to section 366.26.[4]

Thereafter, the Agency recommended that the court terminate parental rights and find H.R. to be adoptable. In its initial assessment report filed in February 2020, the Agency noted that Mother had only sporadic contact with H.R. due in part to Mother's incarceration. H.R.'s current caregivers had expressed an interest in adopting H.R. H.R., however, told a social worker that she did not want to be adopted and wanted to be able to see Mother.

A social worker opined that the relationship between Mother and H.R. "does not rise to the level of a parent-child relationship." The social worker noted that Mother had not been able to maintain regular contact and had continued to be unable to provide for H.R.'s safety. The social worker also noted that H.R. had made "tremendous progress" and "appears to be thriving

---

[4]     Mother indicated that she intended to challenge the setting of the section 366.26 hearing via a writ petition, but her appointed counsel informed this court that there were no viable issues for writ review, leading to the dismissal of Mother's writ proceeding in this court.

in her current placement and the caregivers are eager to provide [H.R.] with a permanent, safe and loving home."

In a series of addendum reports, the Agency reported that Mother had been released from incarceration in April 2020 and began to have supervised visits with H.R. Although the social worker noted that H.R. enjoyed her visits with Mother, she "no longer presents to be anxious about adoption" and would like to stay with her current caregivers.

Shortly before the selection and implementation hearing, Mother filed a petition pursuant to section 388 asserting that her recent progress since being released warranted a change in H.R.'s placement to return to Mother's care. The court found that Mother failed to establish a change of circumstances and denied the petition without a hearing.[5]

Turning to the selection and implementation hearing, Mother submitted stipulated testimony from H.R. In that testimony, H.R. stated that she would be sad if she could not see her Mother again and was "nervous" about being adopted. H.R. indicated that seeing Mother was more important than remaining in her current placement. Mother testified regarding her contact and visits with H.R. Mother wanted H.R. to be returned to her care and opined it would be in the best interest of H.R. to live with Mother. Mother explained that the bond between her and H.R. "is very strong."

After considering the reports, evidence, and testimony and hearing argument from counsel, the court found that H.R. was likely to be adopted. The court also found that none of the exceptions to adoption under section 366.26, subdivision (c)(1) applied. The court found that H.R. had never lived

---

[5] Mother does not challenge this ruling on appeal.

with her siblings and shared no common experiences such that the beneficial sibling relationship exception to adoption did not apply.

Regarding Mother's relationship with H.R., the court found that H.R. was a "very intelligent young lady" who made her wishes known regarding her desire to continue her relationship with Mother. The court, however, noted that given her young age, H.R. had "an extraordinary skewing in her mind towards the positive experiences without real[] regard to the negative experiences and consequences. She is not cognitively or developmentally at a place where she can do that kind of balancing." The court found that Mother maintained regular and consistent contact with H.R., but that given Mother's repeated pattern of substance abuse, H.R. "would benefit more from the permanence of adoption than from preserving the existing relationship [with Mother.]" Accordingly, the juvenile court found by clear and convincing evidence that adoption was the best permanent plan and terminated Mother's parental rights.

Mother appealed.[6]

## DISCUSSION

### I.

Mother contends that the juvenile court and the Agency failed to comply with their duty of inquiry before the court found ICWA does not apply in this case. We disagree.

"Congress enacted ICWA in 1978 in response to 'rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the

---

[6]    Mother's notice of appeal references both the order denying her section 388 petition and the order terminating her parental rights. In her opening brief on appeal, Mother does not contest the denial of her section 388 petition and has therefore abandoned the issue.

6

separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) ICWA established minimum standards that courts are required to follow in involuntary proceedings to place a child in foster care or to terminate parental rights to ensure Indian tribes receive notice "where the court knows or has reason to know that an Indian child is involved." (25 U.S.C. § 1912(a); *Isaiah W., supra,* at p. 8.)

ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); see § 224.1, subd. (a).) The trial court and the Agency have an affirmative and continuing duty in every dependency proceeding to determine whether ICWA applies. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a); *Isaiah W., supra,* at pp. 10-11.) In cases "where the court knows or *has reason to know* that an Indian child is involved," ICWA requires the Agency, or other party seeking adoption or foster care placement, to notify "the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912, italics added; *Isaiah W., supra,* 1 Cal.5th at p. 5.)

This court's decision in *In re D.S.* (2020) 46 Cal.App.5th 1041 (*D.S.*) discussed recent changes to the federal regulations concerning ICWA compliance and subsequent conforming amendments to California's statutory scheme regarding ICWA. (*Id.* at p. 1048.) In *D.S.*, we explained that the resulting clarification of law, found in part in newly-amended section 224.2, "creates three distinct duties regarding ICWA in dependency proceedings.

7

First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child'], *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)." (*D.S., supra,* at p. 1052.)

At the first step, "[s]ection 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, such as the Agency, the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " (*D.S., supra,* 46 Cal.App.5th at pp. 1048-1049.)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. [Citation.]" (*D.S., supra,* 46 Cal.App.5th at p. 1051.)

Here, the facts regarding the juvenile court's ICWA findings are undisputed. When viewed within the proper context, we conclude the

8

juvenile court's inquiry under ICWA was properly limited given the prior dependency proceedings involving H.R. and Mother. In its initial report in this proceeding, the Agency noted that in October 2011, during H.R.'s first dependency proceeding, the juvenile court found ICWA did not apply. Mother did not dispute this fact at any hearing. Instead, at a hearing in August 2019, Mother's counsel indicated that "I've discussed with [Mother] the Indian Child Welfare Act and she has no information." The court noted the prior finding in October 2011 that ICWA did not apply and indicated it would "reiterate that finding subject to any further input from either parent." Mother did not provide additional input or otherwise challenge the court's reliance on the Agency's representations in its reports that ICWA had already been found to not apply to H.R.

At a subsequent hearing, the court noted that during a chambers conference, the court and counsel reviewed information regarding prior court findings that ICWA did not apply in August 2019, August 2016, and in October 2011. Again, Mother did not dispute these facts or provide additional information. Thereafter, the court found that reasonable inquiry had been made and again found that ICWA did not apply.

In challenging the juvenile court's finding, Mother in essence contends that the juvenile court could not rely on its prior determinations that ICWA did not apply. As she correctly notes, both the trial court and the Agency have a continuing duty to determine whether ICWA applies and must revisit a prior determination that ICWA does not apply "if it subsequently receives information providing reason to believe that the child is an Indian child." (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a); *Isaiah W.*, *supra*, 1 Cal.5th at pp. 10-11.)

9

However, the record establishes that the juvenile court fulfilled its duty by relying on its prior findings involving the same family and remaining open to new information that was never submitted. At a hearing on August 8, 2019, the court noted that in a chambers conference, the parties discussed the court's prior findings that ICWA did not apply.[7] The court, however, did not simply rely on those prior findings. The court "reiterate[d]" a prior finding but noted the finding was subject "to any further input from either parent." Mother's counsel expressly stated that she discussed ICWA with Mother, but that Mother "has no information." The juvenile court could reasonably rely on the representations by Mother to find that ICWA did not apply. H.R.'s father never appeared in the action and the Agency was unable to locate him before the court made its ICWA finding despite their due diligence, and he thereafter did not cooperate, precluding the Agency from soliciting additional information from H.R.'s father. The record does not disclose any known relatives of father that could provide additional information.

Nothing in either state or federal law suggests that a juvenile court may not consider prior findings that ICWA does not apply made in earlier proceedings involving the same child. Here, the juvenile court considered those findings as indicated in the Agency's reports, but also continued to solicit and consider whether new information was available that was

_____

[7] In a motion to augment, the Agency asks us to add the juvenile court orders from August 22 and 30, 2016 to the record on appeal. Those orders indicate that in H.R.'s prior proceeding, both of her parents denied having any Indian ancestry. This court may augment the record on appeal to include any document "filed or lodged in the case in the superior court." (Cal. Rules of Court, rules 8.155(a)(1)(A), 8.410(b)(1).) The record does not establish that either of these orders was filed or lodged in the superior court. Accordingly, we deny the motion to augment the record on appeal.

10

sufficient to revisit those findings.  Mother confirmed her prior representations that she had no Indian heritage and, despite the best efforts of the Agency, neither H.R.'s father or any relatives provided additional information.  Accordingly, we see no error by the juvenile court in fulfilling its duty of inquiry or in finding that ICWA did not apply.

## II.

Mother contends that the court erred in selecting adoption as the permanent plan for H.R. following the selection and implementation hearing held pursuant to section 366.26.  She does not contest H.R.'s adoptability, but rather contends that the trial court erred in finding the beneficial parent-child relationship exception to a finding of adoptability does not apply here.  We disagree.

" 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.]  'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.]  It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.]  'The Legislature has declared that California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53 (*Celine R.*).)

"Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' [Citation.]  The circumstance that the court has terminated reunification

services provides 'a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that, termination would be detrimental to the child due to one or more' of specified circumstances. [Citation.]  The Legislature has thus determined that, where possible, adoption is the first choice.  'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

"[I]f the child is adoptable . . . adoption is the norm.  Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child.  The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'  [Citation.]  At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.'  [Citation.]  The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption."  (*Celine R., supra*, 31 Cal.4th at p. 53.)

Mother contends the beneficial parent-child relationship exception applies such that her parental rights should not have been terminated and the court should have selected an alternative permanent plan.  The beneficial parent-child relationship exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the

12

relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent bears the burden in the juvenile court of showing the exception applies. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

The first element that must be established under the beneficial relationship exception requires a showing that the parent maintained regular visitation and contact with the child. (§ 366.26, subd. (c)(1)(B)(i).) The juvenile court found Mother established this element and the Agency does not contest the court's finding on appeal.

However, the parties disagree regarding the second element: whether H.R. would be harmed by terminating the relationship. "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be greatly harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 (*Angel B.*).)

13

"A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . The relationship arises from day-to-day interaction, companionship and shared experiences.' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) "A friendly relationship . . . 'is simply not enough to outweigh the sense of security and belonging an adoptive home would provide.' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) "While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination." (*Angel B.*, *supra*, 97 Cal.App.4th at p. 467, fn. omitted.) "The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)

Mother faults the juvenile court with relying on the potential adoptive parents' willingness to continue contact between H.R. and Mother after adoption to find that H.R. would not be harmed by adoption because she could continue her relationship with Mother. Relying on *In re C.B.* (2010) 190 Cal.App.4th 102 (*C.B.*), Mother contends the court erred in relying on the caregivers' unenforceable promise to allow contact to find that there would be no substantial interference with the parent-child relationship. (*Id.* at p. 128.)

14

However, the court's reasoning in *C.B.* is distinguishable from the situation present in this case. In *C.B.*, the juvenile court placed heavy emphasis on the expectation that visits with the parent would continue to find the parent-child relationship exception did not apply. (*Id.* at p. 127.) Here, on the other hand, the juvenile court alluded to the possibility of continued visits, but also recognized that the caregivers could "curtail" any visits and did not appear to rely on the possibility of future contact in reaching its ultimate conclusion.

Instead, the juvenile court appears to have accepted the positive relationship between H.R. and Mother, but concluded that the benefits of adoption outweigh the benefits of maintaining the existing relationship. This balancing of benefits is the necessary third step of the court's application of the beneficial parent-child relationship exception to adoption. (*In re Logan B.* (2016) 3 Cal.App.5th 1000, 1010-1013.)

On appeal, Mother fails to show that even if we accept the existence of a generally positive relationship between Mother and H.R., the juvenile court abused its discretion by finding that the termination of parental rights would not be sufficiently detrimental to H.R. because the benefits of that relationship outweighed the benefits of adoption. As the court explained, despite the positive aspects of the relationship, H.R.'s relationship with Mother was punctuated with extended periods of "confusion, upheaval, and uncertainty." Over the course of three dependency proceedings, H.R. spent approximately a third of her life outside the care of Mother. Although H.R. enjoyed her visits with Mother, she was thriving in her placement and referred to her caregivers as "Mom/Mommy" and "Dad/Daddy." Although the caregivers earlier suggested they were open to guardianship, by February 2020 they indicated they were only interested in adoption. Thus, depriving

15

H.R. of the benefits of adoption to maintain her relationship with Mother would also potentially deprive H.R. of the benefits of her current placement.

Although H.R.'s desire to maintain her relationship with Mother made the juvenile court's balancing of interests more difficult, we conclude the court carefully considered the competing interests and did not abuse its discretion in finding the benefits of adoption outweighed the benefits of maintaining the parent-child relationship such that there was no compelling reason for finding that termination would be detrimental to the child.

## DISPOSITION

The orders are affirmed.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.